Filed July 27, 2022

On behalf of:
       Patent Owner Masimo Corporation
By:    Jarom D. Kesler (Reg. No. 57,046)
       Joseph R. Re (Reg. No. 31,291)
       Stephen W. Larson (Reg. No. 69,133)
       Jacob L. Peterson (Reg. No. 65,096)
       KNOBBE, MARTENS, OLSON & BEAR, LLP
       2040 Main Street, 14th Floor
       Irvine, CA 92614
       Tel.: (949) 760-0404
       Email:  AppleIPR2021-0208-266@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

_____

IPR2021-00208
Patent 10,258,266

_____

**PATENT OWNER'S NOTICE OF APPEAL TO
THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

IPR2021-00208 – Patent 10,258,266
Apple v. Masimo

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Judgment – Final Written Decision (Paper 32) entered on June 1, 2022 (Attachment A) and from all underlying orders, decisions, rulings, and opinions that are adverse to Masimo related thereto and included therein, including those within the Decision Granting Institution of *Inter Partes* Review, entered June 3, 2021 (Paper 7).   Masimo appeals the Patent Trial and Appeal Board's determination that claims 1-6, 8-16, 18 and 19 of U.S. Patent 10,258,266 are unpatentable, and all other findings and determinations, including but not limited to claim construction, as well as all other issues decided adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2021-00208 involving Patent 10,258,266.

Masimo is concurrently providing true and correct copies of this Notice of Appeal, along with the required fees, to the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit.

IPR2021-00208 – Patent 10,258,266
Apple v. Masimo

Respectfully submitted,

Knobbe, Martens, Olson & Bear, LLP

Dated:  July 27, 2022          By: /Jarom Kesler/
                              Jarom D. Kesler (Reg. No. 57,046)
                              Joseph R. Re (Reg. No. 31,291)
                              Stephen W. Larson (Reg. No. 69,133)
                              Jacob L. Peterson (Reg. No. 65,096)

                              Attorneys for Patent Owner
                              Masimo Corporation

# ATTACHMENT A

Trials@uspto.gov                                                                 Paper 32
571-272-7822                                                          Date: June 1, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

—————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

—————

IPR2021-00208
Patent 10,258,266 B1

—————

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

KINDER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2021-00208
Patent 10,258,266 B1

# I.  INTRODUCTION

## A.  Background

Apple Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") pursuant to 35 U.S.C. §§ 311–319 to institute an *inter partes* review of claims 1–6, 8–16, 18, and 19 ("challenged claims") of U.S. Patent No. 10,258,266 B1 (Ex. 1001, "the '266 patent").  We instituted the petitioned review (Paper 7).

Masimo Corporation ("Patent Owner") filed a Patent Owner Response (Paper 15, "PO Resp.") to oppose the Petition.  Petitioner filed a Reply (Paper 18, "Pet. Reply") to the Patent Owner Response.  Patent Owner filed a Sur-reply (Paper 22, "Sur-reply") to the Reply.  We conducted an oral hearing on March 15, 2022.  A transcript has been entered into the record (Paper 31, "Tr.").

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a).  This Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 1–6, 8–16, 18, and 19 of the '266 patent.  We determine Petitioner has shown by a preponderance of the evidence that those claims are unpatentable.

## B.  Related Matters

The parties identify the following matters related to the '266 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

IPR2021-00208
Patent 10,258,266 B1

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01713 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,624,564 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01714 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01715 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01716 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,194 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01722 (PTAB Oct. 2, 2020) (challenging claims of U.S. Patent No. 10,470,695 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01723 (PTAB Oct. 2, 2020) (challenging claims of U.S. Patent No. 10,470,695 B2);

IPR2021-00208
Patent 10,258,266 B1

     *Apple Inc. v. Masimo Corporation*, IPR2020-01733 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,195 B1);

     *Apple Inc. v. Masimo Corporation*, IPR2020-01737 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,709,366 B1);

     *Apple Inc. v. Masimo Corporation*, IPR2021-00193 (PTAB Nov. 20, 2020) (challenging claims of U.S. Patent No. 10,299,708 B1);

     *Apple Inc. v. Masimo Corporation*, IPR2021-00195 (PTAB Nov. 20, 2020) (challenging claims of U.S. Patent No. 10,376,190 B1); and

     *Apple Inc. v. Masimo Corporation*, IPR2021-00209 (PTAB Nov. 20, 2020) (challenging claims of U.S. Patent No. 10,376,191 B1).

Pet. 1, 72–73;[1] Paper 3, 1, 3–4.

     Patent Owner further identifies certain issued patent applications, as well as other pending and abandoned applications, that claim priority to, or share a priority claim with, the '266 patent. Paper 3, 1–3.

### C. The '266 Patent

     The '266 patent is titled "Multi-Stream Data Collection System for Noninvasive Measurement of Blood Constituents," and issued on April 16, 2019, from U.S. Patent Application No. 16/212,537, filed December 6, 2018. Ex. 1001, codes (21), (22), (45), (54). The '266 patent claims priority through a series of continuation and continuation-in-part applications to Provisional Application Nos. 61/086,060, 61/086,108, 61/086,063, and 61/086,057, each filed on August 4, 2008, as well as 61/091,732 filed on

---

[1] Petitioner lists "U.S. Patent[] 10,299,708 (IPR2020-00193)" as a related *inter partes* review petition. Pet. 73. The case number associated with Patent No. 10,299,708 B1 is IPR2021-00193 and not "IPR2020-00193" as listed by Petitioner.

IPR2021-00208
Patent 10,258,266 B1

August 25, 2008, and 61/078,228 and 61/078,207, both filed July 3, 2008.
*Id.* at codes (60), (63).

The '266 patent discloses a two-part data collection system including a noninvasive sensor that communicates with a patient monitor. *Id.* at 2:31–33. The sensor includes a sensor housing, an optical source, and several photodetectors, and is used to measure a blood constituent or analyte, e.g., oxygen or glucose. *Id.* at 2:22–28, 55–58. The patient monitor includes a display and a network interface for communicating with a handheld computing device. *Id.* at 2:35–41.

Figure 1 of the '266 patent is reproduced below.



Figure 1 illustrates a block diagram of data collection system 100 including sensor 101 and monitor 109. *Id.* at 11:36–38. Sensor 101 includes emitter 104 and detectors 106. *Id.* at 11:48–50. Emitter 104 emits light that is attenuated or reflected by the patient's tissue at measurement site 102. *Id.*

at 13:61–64.  Detectors 106 capture and measure the light attenuated or reflected from the tissue.  *Id.*  In response to the measured light, detectors 106 output detector signal 107 to monitor 109 through front-end interface 108.  *Id.* at 14:16–22.  Sensor 101 also may include tissue shaper 105, which may be in the form of a convex surface that: (1) reduces the thickness of the patient's measurement site; and (2) provides more surface area from which light can be detected.  *Id.* at 10:59–11:3.

Monitor 109 includes signal processor 110 and user interface 112.  *Id.* at 15:6–8.  "[S]ignal processor 110 includes processing logic that determines measurements for desired analytes . . . based on the signals received from the detectors 106."  *Id.* at 15:12–15.  User interface 112 presents the measurements to a user on a display, e.g., a touch-screen display.  *Id.* at 15:38–42.  In response to user input or device orientation, user interface 112 can "reorient its display indicia."  *Id.* at 15:44–48.  The monitor may include storage device 114 and network interface 116.  *Id.* at 15:52–54.  In some embodiments, the monitor, including the display, is attached to the patient by a strap.  *Id.* at 17:64–67.

The '266 patent describes various examples of sensor devices. Figures 14D and 14F, reproduced below, illustrate sensor devices.

IPR2021-00208
Patent 10,258,266 B1



FIG. 14D                    FIG. 14F

Figure 14D illustrates a detector submount and Figure 14F illustrates portions of a detector shell. *Id.* at 6:34–37. As shown in Figure 14D, multiple detectors 1410c are located within housing 1430 and under transparent cover 1432, on which protrusion 605b is disposed. *Id.* at 36:17–24. Figure 14F illustrates detector shell 306f including detectors 1410c on substrate 1400c. *Id.* at 36:63–64. In some embodiments, the detector shell includes walls to separate individual photodiode arrays and to "prevent or reduce mixing of light signals." *Id.* at 22:28–31. Substrate 1400c is enclosed by shielding enclosure 1490 and noise shield 1403, which include window 1492a and window 1492b, respectively, placed above detectors 1410c. *Id.* at 36:65–37:8.

Figures 4A and 4B, reproduced below, illustrate an alternative example of a tissue contact area of a sensor device.

IPR2021-00208
Patent 10,258,266 B1



**FIG. 4A**                                   **FIG. 4B**

Figures 4A and 4B illustrate arrangements of protrusion 405 including measurement site contact area 470. *Id.* at 23:8–14. "[M]easurement site contact area 470 can include a surface that molds body tissue of a measurement site." *Id.* "For example, the measurement site contact area 470 can be generally curved and/or convex with respect to the measurement site." *Id.* at 23:31–33. The measurement site contact area includes windows 420–423 that "mimic or approximately mimic a configuration of, or even house, a plurality of detectors." *Id.* at 23:39–53.

### D.  Illustrative Claim

Of the challenged claims, claims 1 and 9 are independent. Claim 1 is illustrative and is reproduced below.

1. A noninvasive optical physiological sensor comprising:

[a] a plurality of emitters configured to emit light into tissue of a user;

[b] a plurality of detectors configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprise at least four detectors;

[c] a housing configured to house at least the plurality of detectors; and

[d] a lens configured to be located between the tissue of the user and the plurality of detectors when the noninvasive

8

IPR2021-00208
Patent 10,258,266 B1

optical physiological sensor is worn by the user, wherein the lens comprises a single outwardly protruding convex surface configured to cause tissue of the user to conform to at least a portion of the single outwardly protruding convex surface when the noninvasive optical physiological sensor worn by the user and during operation of the noninvasive optical physiological sensor.

Ex. 1001, 44:36–54 (bracketed lettering [a]–[d] added). Independent claim 9 includes limitations similar to limitations [a]–[d] of claim 1, and also includes additional recitations. *Id.* at 45:13–23 (additionally reciting "a lens forming a cover," "a circular housing including a planar surface" and a "grid pattern").

## E. Applied References

Petitioner relies upon the following references:

Ohsaki et al., U.S. Patent Application Publication No. 2001/0056243 A1, filed May 11, 2001, published December 27, 2001 (Ex. 1014, "Ohsaki");

Aizawa, U.S. Patent Application Publication No. 2002/0188210 A1, filed May 23, 2002, published December 12, 2002 (Ex. 1006, "Aizawa");

Inokawa et al., Japanese Patent Application Publication No. 2006-296564 A, filed April 18, 2005, published November 2, 2006 (Ex. 1007, "Inokawa");[2] and

Y. Mendelson, et al., "Design and Evaluation of a New Reflectance Pulse Oximeter Sensor," Association for the Advancement of Medical Instrumentation, Vol. 22, No. 4, 167–173 (1988) (Ex. 1015, "Mendelson-1988").

Pet. 2.

---

[2] Petitioner relies on a certified English translation of Inokawa (Ex. 1008). Ex. 1008, 24. In this Decision, we also refer to the translation.

IPR2021-00208
Patent 10,258,266 B1

Petitioner also submits, *inter alia*, the Declaration of Thomas W. Kenny, Ph.D. (Ex. 1003), and the Second Declaration of Thomas W. Kenny (Ex. 1047). Patent Owner submits, *inter alia*, the Declaration of Vijay K. Madisetti, Ph.D. (Ex. 2004). The parties also provide deposition testimony from Dr. Kenny and Dr. Madisetti, including from this and other proceedings. *See* Exs. 1034–1036, 2006–2009, 2020, 2027.

### F.  Asserted Grounds

Petitioner asserts that claims 1–6, 8–16, 18, and 19 are unpatentable based upon the following grounds (Pet. 2):[3]

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–6, 8–16, 18, and 19 | 103 | Aizawa, Inokawa |
| 1–6, 8–16, 18, and 19 | 103 | Aizawa, Inokawa, Ohsaki |
| 1–6, 8–16, 18, and 19 | 103 | Mendelson-1988, Inokawa |

## II.  DISCUSSION

### A.  Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b). 37 C.F.R.

---

[3] In a section titled "Challenge," Petitioner asserts, *inter alia*, that claims 17, 18, and 29 are unpatentable over 35 U.S.C. § 103 based on the combination of Mendelson-1988, Inokawa, Mendelson-2006 and Beyer. Pet. 1–2. However, Mendelson-2006 and Beyer are not listed as exhibits in the Petition (*see id.* at ii–iii), were not produced into the record as evidence, and Petitioner does not present any arguments regarding the patentability of claims 17, 18, and 29 over these references. The alleged ground challenging claims 17, 18, and 29 based on Mendelson-1988, Inokawa, Mendelson-2006 and Beyer is not part of the Petition and claims 17 and 29 are not addressed in this Decision.

IPR2021-00208
Patent 10,258,266 B1

§ 42.100(b) (2019).  Although both parties contend that no claim term requires express construction (Pet. 3–4; PO Resp. 10), the substance of the parties' briefing demonstrates that there is a dispute regarding the claim term "cover," which appears in independent claim 9.

> 1.  *"cover"*

Independent claim 9 requires "a lens forming a cover of the circular housing."  Ex. 1001, 45:21.  Although independent claim 1 also recites "a lens," it does not recite a "cover."  *Id.* at 44:37–54.

Patent Owner argues that the claimed "cover" excludes "an optically clear adhesive/epoxy" and a "resin on a surface."  PO Resp. 52.  According to Patent Owner, "the '266 Patent distinguishes a resin on a surface from a cover, explaining:  'the cylindrical housing 1430 (and transparent cover 1432) . . . can protect the detectors 1410c and conductors 1412c *more effectively* than currently-available *resin epoxies*.'"  *Id.* (quoting Ex. 1001, 36:37–46).

Patent Owner alleges that Dr. Kenny also "distinguished a sealing resin from a cover, acknowledging a 'layer of sealing resin' is 'one way to protect the components *without using a cover*.'"  *Id.* at 52–53 (quoting Ex. 2009, 395:22–396:17).  Patent Owner argues its understanding is consistent with the prior art cited by Petitioner.  *Id.* at 53 (citing Ex. 1008 ¶ 103, Fig. 17; Ex. 1023 ¶ 35; Ex. 2004 ¶¶ 113–115).

Petitioner replies that "there is nothing in the specification or the prosecution history [of the '266 patent] that would lead a [person of ordinary skill in the art] to conclude that 'cover' should be interpreted based on anything other than its plain meaning."  Pet. Reply 24 (citing *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1368 (Fed. Cir.

11

IPR2021-00208
Patent 10,258,266 B1

2012)).  That plain meaning, according to Petitioner, is that "a cover is merely 'something that protects, shelters, or guards.'"  *Id.* (quoting Ex. 1050; Ex. 1047 ¶ 48).  Petitioner argues that Patent Owner's reliance on the '266 patent Specification takes text out of context and, when context is considered, it is clear that "the epoxy resin to which the '266 patent compares its cover is not [an] epoxy cover . . . but rather epoxy that is applied to solder joints."  *Id.* at 24–25 (citing Ex. 1001, 36:50–59; Ex. 1047 ¶ 50).

Petitioner also contends that Patent Owner "mischaracterizes Dr. Kenny's deposition testimony to say he agreed that 'sealing resin' is somehow distinguished from a cover."  *Id.* at 24.  Petitioner contends that Dr. Kenny simply "clarified that using a sealing resin is 'a pretty common way to protect electronic components.'"  *Id.* (citing Ex. 2009, 395:22–396:17; Ex. 1047 ¶ 49).  Moreover, Petitioner contends that "such extrinsic evidence would not justify departure from plain meaning under *Thorner*."  *Id.*

In its Sur-reply, Patent Owner maintains that the '266 patent "specifically ***distinguishes*** a 'resin' on a surface from a 'cover,'" and Petitioner's opposing reading is not persuasive.  PO Sur-reply 20–21.

Upon review of the record, we disagree with Patent Owner's limiting construction of "cover" to exclude epoxy and resin.  The plain and ordinary meaning of the term does not support Patent Owner's view.  A "cover" ordinarily connotes "something that protects, shelters, or guards."  Ex. 1050 (*Merriam-Webster's Collegiate Dictionary*, 11th ed. (©2005)), 288.  That plain and ordinary meaning is consistent with the '266 patent's description of "flex circuit cover 360, which can be made of plastic or another suitable material . . . [and] can cover and thereby protect a flex circuit (not shown)."

IPR2021-00208
Patent 10,258,266 B1

Ex. 1001, 22:63–65. It also is consistent with the '266 patent's description and illustration of "transparent cover 1432" in Figure 14D, which covers and protects detectors 1410c and conductors 1412c, and which "can be fabricated from glass or plastic, *among other materials*." *See id.* at 36:30–42 (emphasis added), Figs. 14D–14E.

This is not the situation in which a special definition for a claim term has been set forth in the specification with reasonable clarity, deliberateness, and precision, so as to give notice of the inventor's own lexicography. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005); *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Nor do we discern that Patent Owner "demonstrate[d] an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

Here, based upon our review of the intrinsic evidence, no such special definition or express disavowal of the term "cover" to exclude epoxy and resin exists. Patent Owner relies on the following description of Figure 14D in that regard:

> In certain embodiments, the cylindrical housing 1430 (and transparent cover 1432) forms an airtight or substantially airtight or hermetic seal with the submount 1400c. As a result, the cylindrical housing 1430 can protect the detectors 1410c and conductors 1412c from fluids and vapors that can cause corrosion. Advantageously, *in certain embodiments, the cylindrical housing 1430 can protect* the detectors 1410c and conductors 1412c *more effectively than currently-available resin epoxies*, which are sometimes applied to solder joints between conductors and detectors.

13

IPR2021-00208
Patent 10,258,266 B1

Ex. 1001, 36:37–46 (emphases added); *see* PO Resp. 52.  First, the sentence cited by Patent Owner begins with the phrase "[i]n certain embodiments," which indicates the claimed invention is not limited and is open to other embodiments, so there is no lexicography or disavowal here.  Second, we agree with Petitioner's reading of this passage as distinguishing the prior art from the claimed invention based on the *location* of the material (applied only to solder joints between conductors and detectors in the prior art, as opposed to covering the conductors and detectors in the invention) and not the *type* of material.  Third, at best, the '266 patent expresses a preference for a cover to be made of glass or plastic, because such materials provide "more effective[]" protection than resin epoxies that were known when the '266 patent was filed.  *See id.* at 36:42–46.  But even this reading recognizes that resin epoxies provide some amount of protection, albeit perhaps a lesser amount than glass or plastic, and are not excluded from forming the material of a cover.

Dr. Kenny's deposition testimony cited by Patent Owner also does not persuade us that, in the context of the '266 patent, epoxy or resin is excluded from the material of a cover.  Dr. Kenny testifies that "a layer of sealing resin" "[c]ould" be used to protect the electronic components in a sensor (Ex. 2009, 395:22–396:8).  He was then asked "So that would be one way to protect the components without using a cover, correct?" to which he answered "[t]here are many ways to protect the elements other than using a cover" and maintained that the proposed combination of prior art has a "cover" to achieve purposes *other than* protecting electronic components, i.e., "to improve adhesion and to improve light gathering for the operation of the system."  *Id.* at 396:9–17.  He did not squarely testify that sealing resin may never be a cover.

IPR2021-00208
Patent 10,258,266 B1

Accordingly, in the context of the '266 patent, we do not construe the claimed "cover" to exclude epoxy and resin.

### 2. Other Claim Terms

Upon consideration of the entirety of the arguments and evidence presented, we conclude no further explicit construction of any claim term is needed to resolve the issues presented by the arguments and evidence of record. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (per curiam) (claim terms need to be construed "only to the extent necessary to resolve the controversy" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### B. Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness.[4] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion

---

[4] Patent Owner does not present objective evidence of non-obviousness.

IPR2021-00208
Patent 10,258,266 B1

claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of prior art elements would have produced a predictable result weighs in the ultimate determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

## C.  Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as that possessed by a person having "a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information." Pet. 4 (citing Ex. 1003 ¶¶ 21–22). "Alternatively, the person could have also had a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline." *Id.*

Patent Owner makes several observations regarding Petitioner's identified level of skill in the art but, "[f]or this proceeding, [Patent Owner] nonetheless applies Petitioner's asserted level of skill." PO Resp. 10–11 (citing Ex. 2004 ¶¶ 35–38).

We adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

IPR2021-00208
Patent 10,258,266 B1

### D. *Obviousness over the Combined Teachings of Aizawa and Inokawa*

Petitioner contends that claims 1–6, 8–16, 18, and 19 of the '266 patent would have been obvious over the combined teachings of Aizawa and Inokawa. Pet. 7–44.

### 1. *Overview of Aizawa (Ex. 1006)*

Aizawa is a U.S. patent application publication titled "Pulse Wave Sensor and Pulse Rate Detector," and discloses a pulse wave sensor that detects light output from a light emitting diode and reflected from a patient's artery. Ex. 1006, codes (54), (57).

Figure 1(a) of Aizawa is reproduced below.



Figure 1(a) is a plan view of a pulse wave sensor. *Id.* ¶ 23. As shown in Figure 1(a), pulse wave sensor 2 includes light emitting diode ("LED") 21, four photodetectors 22 symmetrically disposed around LED 21, and holder 23 for storing LED 21 and photodetectors 22. *Id.* Aizawa discloses that, "to further improve detection efficiency, . . . the number of the photodetectors 22 may be increased." *Id.* ¶ 32, Fig. 4(a). "The same effect can be obtained when the number of photodetectors 22 is 1 and a plurality of light emitting diodes 21 are disposed around the photodetector 22." *Id.* ¶ 33.

IPR2021-00208
Patent 10,258,266 B1

Figure 1(b) of Aizawa is reproduced below.



Figure 1(b) is a sectional view of the pulse wave sensor. *Id.* ¶ 23. As shown in Figure 1(b), pulse wave sensor 2 includes drive detection circuit 24 for detecting a pulse wave by amplifying the outputs of photodetectors 22. *Id.* Arithmetic circuit 3 computes a pulse rate from the detected pulse wave and transmitter 4 transmits the pulse rate data to an "unshown display." *Id.* The pulse rate detector further includes outer casing 5 for storing pulse wave sensor 2, acrylic transparent plate 6 mounted to detection face 23a of holder 23, and attachment belt 7. *Id.*

Aizawa discloses that LED 21 and photodetectors 22 "are stored in cavities 23b and 23c formed in the detection face 23a" of the pulse wave sensor. *Id.* ¶ 24. Detection face 23a "is a contact side between the holder 23 and a wrist 10, respectively, at positions where the light emitting face 21s of the light emitting diode 21 and the light receiving faces 22s of the photodetectors 22 are set back from the above detection face 23a." *Id.* Aizawa discloses that "a subject carries the above pulse rate detector 1 on the inner side of his/her wrist 10 . . . in such a manner that the light emitting face 21s of the light emitting diode 21 faces down (on the wrist 10 side)." *Id.* ¶ 26. Furthermore, "the above belt 7 is fastened such that the acrylic

IPR2021-00208
Patent 10,258,266 B1

transparent plate 6 becomes close to the artery 11 of the wrist 10. Thereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶¶ 26, 34.

### 2. Overview of Inokawa (Ex. 1008)

Inokawa is a Japanese published patent application titled "Optical Vital Sensor, Base Device, Vital Sign Information Gathering System, and Sensor Communication Method," and discloses a pulse sensor device. Ex. 1008 ¶ 6.

Figure 1 of Inokawa is reproduced below.



Figure 1 illustrates a schematic view of a pulse sensor. *Id.* ¶ 56. Pulse sensor 1 includes box-shaped sensor unit 3 and flexible annular wristband 5. *Id.* ¶ 57. Sensor unit 3 includes a top surface with display 7 and control switch 9, and a rear surface (sensor-side) with optical device component 11 for optically sensing a user's pulse. *Id.*

IPR2021-00208
Patent 10,258,266 B1

Figure 2 of Inokawa is reproduced below.



Figure 2 illustrates a schematic view of the rear surface of the pulse sensor. *Id.* ¶ 58. The rear-side (sensor-side) of pulse sensor 1 includes a pair of light-emitting elements, i.e., green LED 21 and infrared LED 23, as well as photodiode 25 and lens 27. *Id.* In various embodiments, Inokawa discloses that the sensor-side lens is convex. *See id.* ¶¶ 99, 107. Green LED 21 senses "the pulse from the light reflected off of the body (i.e.[,] change in the amount of hemoglobin in the capillary artery)," and infrared LED 23 senses body motion from the change in reflected light. *Id.* ¶ 59. The pulse sensor stores this information in memory. *Id.* ¶ 68. To read and store information, the pulse sensor includes a CPU that "performs the processing to sense pulse, body motion, etc. from the signal . . . and temporarily stores the analysis data in the memory." *Id.* ¶ 69.

IPR2021-00208
Patent 10,258,266 B1

Figure 3 of Inokawa is reproduced below.



Figure 3 illustrates a schematic view of a pulse sensor mounted to a base device. *Id.* ¶ 60. Pulse sensor 1 is depicted as mounted to base device 17, which "is a charger with communication functionality." *Id.* When so mounted, sensor optical device component 11 and base optical device component 41 face each other in close proximity. *Id.* ¶ 66. In this position, pulse sensor 1 can output information to the base device through the coupled optical device components. *Id.* ¶ 67. Specifically, the pulse sensor CPU performs the controls necessary to transmit pulse information using infrared LED 23 to photodetector 45 of base device 17. *Id.* ¶¶ 67, 70, 76. In an alternative embodiment, additional sensor LEDs and base photodetectors can be used to efficiently transmit data and improve accuracy. *Id.* ¶ 111.

### 3.   Independent Claim 1

Petitioner contends that claim 1 would have been obvious over the combined teachings of Aizawa and Inokawa.  Pet. 13–23 (combination), 23–30 (claim 1).

#### i.    A noninvasive optical physiological sensor comprising:"

On this record, the cited evidence supports Petitioner's undisputed contention that Aizawa discloses a noninvasive optical physiological sensor, i.e., a pulse sensor worn on a wearer's wrist.  Pet. 23; *see, e.g.*, Ex. 1006 ¶ 2 ("[A] pulse wave sensor for detecting the pulse wave of a subject from light reflected from a red corpuscle in the artery of a wrist of the subject by irradiating the artery of the wrist with light.").

#### ii.    [a] "a plurality of emitters configured to emit light into tissue of a user;"

Petitioner's Undisputed Contentions

Petitioner contends that Aizawa discloses one emitter—LED 21—and also states that, in certain embodiments, multiple LEDs may be employed. Pet. 7–8, 17–18.  Patent Owner does not dispute this contention, and we agree with Petitioner.  *See* Ex. 1006 ¶¶ 23 ("LED 21"), 32 ("The arrangement of the light emitting diode 21 and the photodetectors 22 is not limited to this.").  For example, Aizawa explains that "[t]he same effect can be obtained when the number of photodetectors 22 is 1 and a plurality of light emitting diodes 21 are disposed around the photodetector." *Id.* ¶ 33.

Petitioner also contends that Inokawa teaches a sensor with two LEDs–a green LED to sense pulse and an infrared LED to sense body motion.  Pet. 10–11.  Petitioner contends that when Inokawa's sensor is

IPR2021-00208
Patent 10,258,266 B1

mounted on a base device, the infrared LED also is used to wirelessly transmit vital information to the base device. *Id.* at 12–13. Patent Owner does not dispute these contentions, and we agree with Petitioner. Inokawa teaches a pair of LEDs 21, 23, where "the basic function of the S-side green LED 21 is to sense the pulse from the light reflected off of the body . . ., while the S-side infrared LED 23 serves to sense body motion from the change in this reflected light." Ex. 1008 ¶¶ 58–59. Inokawa also explains that "vital sign information stored in the memory 63 [of the sensor], such as pulse and body motion, is transmitted to the base device 17 using the S-side infrared LED 23 of the pulse sensor 1 and the B-side PD 45 of the base device 17," such that "there is no need to use a special wireless communication circuit or a communication cable." *Id.* ¶¶ 76–77.

Petitioner's Disputed Contentions

Moreover, Petitioner contends that a person of ordinary skill in the art would have been motivated to "provid[e] an additional emitter to Aizawa [to] allow Aizawa's device to use its existing infrared LED to detect body motion while using the added green LED to detect pulse," which would have provided "more reliable pulse measurement that takes into account and corrects for inaccurate readings stemming from body movement." Pet. 18, 24; Ex. 1003 ¶¶ 71–73.

As a second and independent motivation, Petitioner also contends that incorporating Inokawa's teachings would have allowed for wireless data communication from Aizawa's sensor, without the need for a physical communications cable or a separate wireless communication circuit. Pet. 20–21. Petitioner contends that although Aizawa discloses data transmission, Aizawa "is silent about how such transmission would be

IPR2021-00208
Patent 10,258,266 B1

implemented." *Id.* at 20. According to Petitioner, a skilled artisan "would have further recognized that incorporating Inokawa's base device and LED-based data transmission would allow Aizawa to upload data from its sensor in a way that is wireless (thus avoiding the problems of a physical cable) and that does not require a separate RF circuit," and which would "improve data transmission accuracy by using the second LED, such as the green LED, to transmit checksum information." *Id.* at 21 (citing, *e.g.*, Ex. 1003 ¶¶ 76–78).

To illustrate its proposed modification, Petitioner includes annotated and modified views of Aizawa's Figure 1(b), reproduced below. Pet. 19; *see also id.* at 24 (same); Ex. 1003 ¶ 72.



Petitioner's modified figures depict the sensor of Aizawa in which the single emitter has been divided into two emitters operating at two different wavelengths, as Petitioner contends would have been rendered obvious by Inokawa. Pet. 18–19, 23–24. Petitioner contends that this modification entails use of a known solution to improve similar systems in the same way and would have achieved predictable results. *Id.* at 19, 22–23 (citing Ex. 1003 ¶¶ 73–74, 80); *see also id.* at 23–24 (citing, *e.g.*, Ex. 1003 ¶¶ 69–81).

IPR2021-00208
Patent 10,258,266 B1

Patent Owner's Arguments

Patent Owner disputes Petitioner's contentions regarding the obviousness of modifying Aizawa to include two emitters. *See* PO Resp. 37–43; Sur-reply 13–15.

First, Patent Owner argues that neither Aizawa nor Inokawa discloses a device with both multiple detectors *and* multiple emitters in the *same* sensor, because Aizawa's embodiments have either a single emitter and multiple detectors (e.g., Ex. 1006, Fig. 1(a)) or multiple emitters and a single detector (e.g., *id.* ¶ 33), and Inokawa discloses multiple emitters and a single detector (e.g., Ex. 1008, Fig. 2). *See* PO Resp. 37–38 (citing, e.g., Ex. 2004 ¶¶ 79–80).

Second, Patent Owner argues that the evidence does not support either of Petitioner's two proffered motivations for modifying Aizawa to include two emitters. As to the first motivation (to measure body movement using a second emitter), Patent Owner asserts that Dr. Kenny erroneously testifies that Aizawa cannot do this with its single emitter. PO Resp. 38 (citing, e.g., Ex. 1006 ¶ 15; Ex. 2007, 400:7–401:10; Ex. 2004 ¶ 84). Patent Owner argues that "Aizawa, however, expressly states that it provides a 'device for ***computing*** the ***amount*** of motion load from the pulse rate.'" *Id.* at 39.

As to Petitioner's second motivation (to enable transmission of data to a base device using an optical communication link), Patent Owner argues that "Aizawa ***already*** includes a wireless transmitter . . . so Aizawa does not need to incorporate Inokawa's base-device [optical] data transmission arrangement." PO Resp. 39–40 (citing, e.g., Ex. 1006 ¶¶ 23, 28, 35; Ex. 2004 ¶¶ 85–86). Indeed, Patent Owner argues "Dr. Kenny acknowledged Aizawa does not indicate there are any problems with Aizawa's form of data transmission." *Id.* at 40 (citing Ex. 2007, 409:13–

IPR2021-00208
Patent 10,258,266 B1

410:2).  Patent Owner further argues that "Aizawa's goal is 'real-time measuring' with the transmitter 'transmitting the measured pulse rate data to a display'" but that "Inokawa's base device, however, only transmits pulse rate data 'when the pulse sensor . . . is mounted onto the base device'" and, thus, "*eliminates* the ability to take and display *real-time* measurements." *Id.* at 40–41 (citing, e.g., Ex. 1006 ¶¶ 4, 15; Ex. 1008, Abstract; Ex. 2004 ¶ 86; Ex. 2009, 381:18–382:8, 383:22–385:9, 390:5–392:3).

Patent Owner insists Inokawa does not aid Petitioner's case, because Inokawa discloses the benefits of using a second emitter in only two situations, i.e., first, to improve over a "mechanically-connected system," e.g., with a cable for communication, and, second, to avoid use of a "dedicated wireless communication circuit," whereas "Aizawa *already* uses wireless transmission to provide real-time heart measurements." *Id.* at 41–42 (citing, e.g., Ex. 1008 ¶ 4; Ex. 2004 ¶ 87).

Third, Patent Owner accuses Petitioner and Dr. Kenny of overlooking further complications that would ensue from modifying Aizawa to have two emitters.  Patent Owner argues that Dr. Kenny overlooked how placing "two LEDs in close proximity may cause thermal interference that could create significant issues for sensor performance."  PO Resp. 42 (citing, e.g., Ex. 2004 ¶ 88; Ex. 2012, 76–77).  Patent Owner also argues that in the proposed modification, when Dr. Kenny added a second LED, "he widened [Aizawa's] cavity in his figure without disclosing in his declaration that he had done so," which could impact optical performance of the device.  *Id.* at 42–43.

IPR2021-00208
Patent 10,258,266 B1

Petitioner's Reply

Concerning Petitioner's first motivation, Petitioner asserts that
Aizawa does not disclose any details related to data transmission, and adding
an additional LED enables the sensor to distinguish between blood flow and
body movement, which provides a "more reliable" pulse measurement,
which is Petitioner's asserted improvement to Aizawa.  Pet. Reply 16
(citing, e.g., Ex. 1003 ¶ 72; Ex. 2007, 401:11–402:4; Ex. 1047 ¶ 36).
Moreover, Petitioner contends that by using multiple LEDs at different
wavelengths, "two separate signals" can be collected, which "will allow
Aizawa's system to 'take into account and correct for inaccurate readings
related to body movement' by subtracting the 'signal component
corresponding to body movement [] from the pulse signal to help better
isolate the desired pulse data.'"  *Id.* (quoting Ex. 1003 ¶ 72).

Concerning Petitioner's second motivation, Petitioner maintains that
Inokawa's use of two emitters having different wavelengths to upload data
to a base device using optical communication advantageously improves the
accuracy of the transmission by providing checksum information.  *Id.* at 17
(citing, e.g., Ex. 1003 ¶ 78; Ex. 1008 ¶ 111, 44, 48; Ex. 2007, 407:7–408:20,
416:5–15; Ex. 1047 ¶ 38).  Moreover, Petitioner notes that Aizawa mentions
real-time measurement only once and does not "mention that such data must
also be transmitted to some external device in real time."  *Id.* at 18 (citing
Ex. 1047 ¶ 38).  Likewise, Petitioner explains that a person of ordinary skill
in the art "would have been fully capable of weighing potential benefits
associated with different transmission methods, for instance recognizing that
a quicker transmission may be achieved in one instance and a more accurate
one in another."  *Id.*

IPR2021-00208
Patent 10,258,266 B1

As to the "other complications" that Patent Owner alleges would result from the proposed modification, Petitioner asserts "such issues are 'part of what [a person of ordinary skill in the art] would bring . . . to the problem and would know how to make the changes needed.'" *Id.* at 18 (quoting Ex. 2007, 384:8–388:12; Ex. 1047 ¶ 39).

Patent Owner's Sur-reply

Concerning Petitioner's first motivation, Patent Owner argues that Inokawa's disclosure is just as sparse as Aizawa's disclosure regarding how to use optical data to measure body movement. Sur-reply 13–14 (citing Ex. 1008 ¶ 59). Patent Owner also asserts that "Petitioner cites nothing in Inokawa that suggests" that Inokawa's two emitter data gathering is more reliable or otherwise superior to Aizawa's single emitter data gathering. *Id.*

Concerning Petitioner's second motivation, Patent Owner argues that the proposed modification eliminates Aizawa's ability to conduct "***real-time*** collection and display of physiological measurements—a key goal of Aizawa's system." *Id.* at 14 (citing Ex. 1006 ¶¶ 4, 15; Ex. 2007, 402:6–11; Ex. 2020 ¶ 101).

Patent Owner also notes that Petitioner does not dispute that the proposed modification would cause problems such as "additional cost, energy use, and thermal problems" that would ensue from using two emitters in the Aizawa device. *Id.* at 15.

Analysis

Upon review of the foregoing, we conclude that a preponderance of the evidence supports Petitioner's contention that it would have been

IPR2021-00208
Patent 10,258,266 B1

obvious to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED, in light of Inokawa.

First, a person of ordinary skill in the art would have been motivated to make this replacement to improve the pulse measurements recorded by Aizawa's detector 1. Inokawa teaches that the infrared LED's signal can be used "to detect vital signs" such as "body motion," and the green LED's signal can be "used to detect pulse." Ex. 1008, Fig. 2, ¶¶ 14, 58–59.

Patent Owner correctly points out that Aizawa describes its single-emitter detector 1 as transmitting its pulse data to "a device for computing the amount of motion load from the pulse rate." Ex. 1006 ¶¶ 15, 28, 35. But, this description is the only disclosure in Aizawa cited by Patent Owner as relating to computing a motion characteristic of the user. Further, we are unable to discern any other disclosure in Aizawa relating to motion computation, or what Aizawa proposes to do with its motion computation. *See id.* Based on the sparse nature of Aizawa's disclosure concerning motion load, it is not clear exactly what Aizawa proposes to do with the computed motion load, after it is computed. *See, e.g.*, Ex. 1047 ¶ 36 ("Patent Owner fails to explain how Aizawa senses and computes motion load. Indeed, Aizawa is completely silent on this point."). Aizawa does, however, describe the motion load as being computed "from the pulse rate," rather than being an input to the pulse rate calculation. Ex. 1006 ¶¶ 15, 35.

In a deposition for other proceedings related to this *inter partes* review, *see supra* § I.B, Dr. Kenny was asked whether it was his understanding that "Aizawa's sensor could not account for motion load?"; Dr. Kenny answered that "Aizawa's sensor attempts to prevent motion load rather than account for it." Ex. 2007, 400:7–11 (deposition for IPR2020-01520, IPR2020-01537, and IPR2020-01539). He explained that, because

IPR2021-00208
Patent 10,258,266 B1

Aizawa uses only a single emitter with a single wavelength, "what [Aizawa] sees as a signal would be some mixture of pulse rate and motion load if there was no effort to prevent motion load," so Aizawa seeks to solve the problem of "prevent[ing] motion load from corrupting the pulse rate signal." *Id.* at 400:12–401:10. Dr. Kenny did not further explain this distinction between preventing and accounting for motion load in his deposition testimony cited by the parties as relating to this issue. *Id.* at 400:7–402:4. We do not rely on this distinction as a basis for our present decision, because we find no express support for it in Aizawa's disclosure (*see* Ex. 1006 ¶¶ 15, 28, 35), and it is not explained in persuasive detail by Dr. Kenny.

We nonetheless credit Dr. Kenny's declaration testimony that a person of ordinary skill in the art, upon reviewing Inokawa's disclosure of using two emitters of different wavelengths to calculate a user's pulse and motion separately, would have understood that these two separate measurements would "allow for a more reliable pulse measurement that takes into account *and corrects for* inaccurate readings stemming from body movement" by "subtracting the 'signal component corresponding to body movement [] from the pulse signal to help better isolate the desired pulse data." Ex. 1047 ¶¶ 36, 37 ("processed in a way to compensate for movement and create a more reliable measurement of the physiological parameter"); Ex. 1003 ¶¶ 71–73. Aizawa does not disclose using the computed motion load in this fashion, so it appears that this would improve upon the accuracy of Aizawa's pulse measurements, by using the computed motion load to isolate and account for noise. *See* Ex. 1006 ¶¶ 15, 28, 35.

Dr. Madisetti offers no meaningful opposing testimony in this regard. *See, e.g.*, Ex. 2004 ¶ 84. Instead, Dr. Madisetti incorrectly reads Dr. Kenny's motivation testimony as being limited to the desirability of

IPR2021-00208
Patent 10,258,266 B1

adding the bare ability to measure body movement to Aizawa. *See id.* In fact, Dr. Kenny further testified that it would have been beneficial to *use* the measured body movement to *improve* the pulse measurement of the device. *See* Ex. 1003 ¶¶ 71–74; Ex. 1047 ¶¶ 36–37. Dr. Madisetti does not address that testimony. *See* Ex. 2004 ¶ 84.

Thus, because Dr. Madisetti's testimony sets up a straw man to attack, rather than directly addressing the entirety of Dr. Kenny's testimony in this regard, Dr. Kenny's testimony stands unrebutted in the record before us. Dr. Kenny's testimony also makes intuitive sense that measuring the user's motion *separately* from the user's pulse, for example by using two interrogating emitters of two different wavelengths, would provide a reliable means of correcting the pulse data for motion artifacts by using the separately measured motion data, rather than by trying to segregate these two components in the single data stream provided by Aizawa's single emitter device. *See, e.g.*, Ex. 1047 ¶¶ 36–37. We, therefore, are persuaded by Dr. Kenny's unrebutted testimony that using two emitters of different wavelengths would improve Aizawa's device in this way.

Independently, we are also persuaded that a person of ordinary skill in the art would have been motivated to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED, to provide a reliable method of uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1 to another device for display to the user. Inokawa expressly touts such optically-based uploading of data from Inokawa's wrist-worn sensor 1 to Inokawa's base device 17 as a benefit of incorporating two emitters in sensor 1. *See* Ex. 1008, Figs. 3, 19, ¶¶ 3–7, 14, 76–77, 109–111. Inokawa identifies two specific benefits of this optically-based data communication means. First, the infrared LED can transmit the pulse data, and the green

31

IPR2021-00208
Patent 10,258,266 B1

LED can separately transmit "checksum" information to increase the accuracy of data transmission. *Id.* at Fig. 19, ¶¶ 14, 109–111. Second, using light emitters in this fashion to perform two functions (data collection by emitting light into the user's wrist, and data transmission by emitting light to photodetectors in a base device) obviates the need for providing "a special wireless communication circuit [in the wrist-worn sensor 1] or a communication cable." *Id.* ¶¶ 3–7, 76–77.

Patent Owner correctly points out that Aizawa already has a "transmitter" 4 for uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1 to another device for processing and for display to the user. Ex. 1006, Fig. 1(b), ¶¶ 15, 23, 28, 35. However, Aizawa's Figure 1(b) illustrates transmitter 4 only as an empty box contained within outer casing 5, and Aizawa's written description does not provide further structural details concerning transmitter 4. *See id.* In particular, Aizawa does not describe exactly how transmitter 4 transmits its data to the other device. *See id.*

Patent Owner contends that Aizawa's transmitter 4 is a "wireless" transmitter, and Dr. Kenny agreed to as much during his deposition. *See, e.g.*, PO Resp. 40; Ex. 2007, 414:19–21. They appear to equate "wireless" communication to radio frequency communication, and not to include optical communication, even though both radio frequency and optical communication do not use a wire. Based on the foregoing testimony, we assume, for this decision, that Aizawa contemplates radio frequency communication as one embodiment by which transmitter 4 may transmit data to devices other than detector 1.

Patent Owner argues, and Dr. Madisetti testifies, that Aizawa's express disclosure goes even further. They assert Aizawa's "goal" is to

IPR2021-00208
Patent 10,258,266 B1

measure and display pulse data *in real time during exercise*, using the
wireless transmitter. *See, e.g.*, PO Resp. 39–40; Ex. 2004 ¶¶ 86 ("the ability
to take and display real-time measurements, one of Aizawa's stated goals"),
87. We find that Aizawa does not support this assertion. Instead, Aizawa
discusses prior art devices that "estimat[e] a burden on the heart of a person
who takes exercise by *real-time measuring* his/her heart rate at the time of
exercise" (Ex. 1006 ¶ 4 (emphasis added)), and then describes Aizawa's
detector 1 as having a transmitter for transmitting the measured pulse rate
data to another device for display (*id.* ¶ 15). Aizawa does not indicate when
this transmission occurs. Aizawa also refers to "noise caused by the shaking
of the body of the subject" as a problem to be addressed (*id.* ¶ 6), but this
problem occurs regardless of whether the shaking results from exercise or
the normal movement of the user's wrist over the course of the day. Thus,
Aizawa does not tout, as an important feature of Aizawa's invention, the
*real time display* of pulse rate data during exercise, regardless of whether the
data gathered by Aizawa's wrist-worn detector 1 is transmitted wirelessly or
otherwise. *Id.* ¶¶ 4, 6, 15.

No doubt, a person of ordinary skill in the art would have viewed the
capability of a wrist-worn pulse detector to transmit its pulse data to another
device for display in real time while the user is exercising to be a desirable
feature in some cases, even if this is not one of Aizawa's specifically stated
goals. *See, e.g.*, Ex. 1048 ¶ 67 (Dr. Kenny stating: "By wirelessly
transmitting the collected data . . . the condition of a subject [can be
determined] 'remotely.'"); Ex. 2009, 393:6–14 (in a deposition for other
related proceedings, Dr. Kenny agreeing that a person of ordinary skill in the
art "would have seen the ability to wirelessly transmit collected data as an
advantage"). Nonetheless, Inokawa expressly discloses that, in other cases,

IPR2021-00208
Patent 10,258,266 B1

the benefits achieved by wireless transmission can be outweighed by obviating the need for the wrist-worn sensor to include a special wireless communication circuit. *See* Ex. 1008 ¶¶ 3–7 (discussing problems associated with wireless transmission, such as the need for a dedicated circuit, which is avoided by Inokawa's system that risks "few malfunctions" and has a "simple structure"), 76–77 ("As a result, there is no need to use a special wireless communication circuit . . ., which makes it possible to transmit vital sign information to the base device 17 accurately, easily, and without malfunction."). We therefore conclude that Petitioner's case for obviousness in this regard is supported by a preponderance of the evidence. *See, e.g.*, *In re Urbanski*, 809 F.3d 1237, 1243–44 (Fed. Cir. 2016) (persons of ordinary skill in the art may be motivated to pursue desirable properties of one prior art reference, even at the expense of foregoing a benefit taught by another prior art reference).

We disagree with Patent Owner's argument that Petitioner's case for obviousness is deficient on the basis that neither Aizawa nor Inokawa expressly discloses a wrist-worn sensor device that has *both* a plurality of emitters *and* at least four detectors, as claim 1 recites. Obviousness does not require "'some motivation or suggestion to combine the prior art teachings' [to] be found in the prior art." *KSR*, 550 U.S. at 407, 415–418. Nor does it require the bodily incorporation of Inokawa's device into Aizawa's device. *See, e.g.*, *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) (test for obviousness is not whether the features of one reference may be bodily incorporated into the structure of the other reference, but rather is "what the combined teachings of the references would have suggested to those of ordinary skill in the art"); *see also In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (nonobviousness is not established by attacking references

34

IPR2021-00208
Patent 10,258,266 B1

individually when unpatentability is predicated upon a combination of prior art disclosures). Instead, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton," and "in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *KSR*, 550 U.S. at 420–421.

In this case, we are persuaded that a person of ordinary skill in the art would have been motivated to modify Aizawa's wrist-worn detector 1 to replace its single near infrared LED 21 with an infrared LED and a green LED, based on Inokawa, for all the reasons provided above. A person of ordinary skill in the art would additionally have known to keep all four detectors 22 that are already present in Aizawa's detector 1, so that "[e]ven when the attachment position of the sensor is dislocated, a pulse wave can be detected accurately," as disclosed by Aizawa. Ex. 1006 ¶¶ 9, 27. In short, the combination of Aizawa and Inokawa teaches that having multiple emitters is beneficial, and having multiple detectors is beneficial, for different and not inconsistent reasons.

Finally, we agree with Petitioner's position that any thermal interference and power consumption issues that may arise in Aizawa's wrist-worn pulse detector, by using two emitters instead of one emitter, are well within the capabilities of a person of ordinary skill in the art to solve. We credit Dr. Kenny's testimony in this regard. *See* Ex. 1003 ¶¶ 74, 80 ("would have led to the predictable result of more accurate and convenient data transmission without significantly altering or hindering the functions performed by Aizawa's sensor"); Ex. 1047 ¶ 39. For example, Dr. Kenny acknowledges that Aizawa already discloses adding additional emitters. Ex. 1003 ¶ 39 (citing Ex. 1006 ¶ 33). Dr. Kenny further testifies that this modification "amount[s] to nothing more than the use of a known technique

35

IPR2021-00208
Patent 10,258,266 B1

[i.e., Inokawa's use of two emitters in a wrist-worn pulse detector] to improve similar devices [i.e., Aizawa's wrist-worn pulse detector] in the same way, and combining prior art elements according to known methods to yield predictable results." *Id.* ¶¶ 74, 80.

Patent Owner cites portions of Dr. Kenny's deposition testimony that, in Patent Owner's view, indicate Dr. Kenny fails to appreciate the significance of optical interference complications posed by adding a second emitter to Aizawa's device, and fails to explain how this would have been overcome. *See* PO Resp. 42–43 (citing Ex. 2007, 379:17–21, 384:16–388:16, 389:17–390:20, 394:11–395:17). We have reviewed this deposition testimony, and we conclude Patent Owner overstates its significance. It establishes, at most, that Dr. Kenny did not expressly address this issue in his declaration (Exhibit 1003), but Dr. Kenny's opinion is that this would have been within the capability of a person of ordinary skill in the art to resolve. Based on the evidentiary record presented to us, we agree with Dr. Kenny. For example, Inokawa discloses a wrist-worn pulse sensor 1 having two emitters 21 and 23 in close proximity to each other. *See* Ex. 1008, Figs. 1–2. An artisan must be presumed to know something about the art apart from what the relied-upon references disclose. *See In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962).

Dr. Madisetti's testimony opposing Dr. Kenny's foregoing opinion is premised solely on Dr. Kenny's alleged failure to explain how issues that arise from adding a second emitter to Aizawa would have been solved; Dr. Madisetti does not provide any affirmative reason why these issues would have been difficult for a person of ordinary skill in the art to solve, in the context of Aizawa's device or wrist-worn pulse sensing devices in general. *See* Ex. 2004 ¶ 88.

IPR2021-00208
Patent 10,258,266 B1

Thus, we conclude a person of ordinary skill in the art would have been motivated to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED, and would have had a reasonable expectation of success in doing so.

        *iii.*     *"[b] a plurality of detectors configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprise at least four detectors"*

The cited evidence supports Petitioner's undisputed contention that Aizawa discloses at least four detectors 22 that detect light that has been emitted by LED 21 and attenuated by body tissue. Pet. 24–25; *see, e.g.*, Ex. 1006 ¶ 27 (disclosing that light emitted from LED 21 "is reflected by a red corpuscle running through the artery 11 of the wrist 10 and . . . is detected by the plurality of photodetectors 22 so as to detect a pulse wave"); Ex. 1003 ¶¶ 82–83.

        *iv.*     *"[c] a housing configured to house at least the plurality of detectors; and"*

The cited evidence supports Petitioner's undisputed contention that Aizawa discloses holder 23, which houses the detectors in a portion of the housing. Pet. 25–26; *see, e.g.*, Ex. 1006 ¶ 23 ("holder 23 for storing . . . light emitting diode 21 and the photodetectors 22"), Figs. 1(a)–(b) (depicting holder 23 surrounding detectors 22).

        *v.*     *"[d] a lens configured to be located between the tissue of the user and the plurality of detectors when the noninvasive optical physiological sensor is worn by the user, wherein the lens comprises a single outwardly protruding convex surface configured to cause tissue of the user to conform to at least a*

IPR2021-00208
Patent 10,258,266 B1

> *portion of the single outwardly protruding convex*
> *surface when the noninvasive optical physiological*
> *sensor worn by the user and during operation of the*
> *noninvasive optical physiological sensor."*

Petitioner's Contentions

With reference to an annotated version of Aizawa's Figure 1(b)
(reproduced below), Petitioner contends that Aizawa "teaches a light
permeable cover in the form of an acrylic transparent plate 6 (blue) that is
mounted at the detection face 23a" of the sensor, between the user's tissue
and the emitter/detector assembly. Pet. 8–9 (citing Ex. 1006, Fig. 1(b),
¶ 23); Ex. 1003 ¶¶ 55–56.



The figure above shows Petitioner's annotated version of Aizawa's
Figure 1(b), in which transparent plate 6 is shaded in blue and identified as
"Light permeable cover." Petitioner contends that beyond disclosing that the
acrylic transparent plate "helps improve 'detection efficiency,' Aizawa does
not provide much other detail, for instance regarding its shape." *Id.* at 14
(citing Ex. 1006 ¶ 30).

IPR2021-00208
Patent 10,258,266 B1

Petitioner reasons, however, that one of ordinary skill in the art would have "looked to Inokawa to enhance light collection efficiency, specifically by modifying the flat cover of Aizawa to include a lens." *Id.* at 14 (citing Ex. 1003 ¶¶ 87–91), 27–28 ("obvious to modify the flat acrylic plate of Aizawa . . . into a lens having a single outwardly protruding convex surface . . . to further Aizawa's objective of enhancing its light collection efficiency"). In that regard, Petitioner points to Inokawa's Figure 2. Petitioner's annotated version of that figure is reproduced below.



*Id.* at 14. Figure 2 above depicts Inokawa's lens 27 shaded in blue.

Petitioner expresses that Inokawa teaches that its cover may be either flat such that the surface is less prone to scratches or may be in the form of the lens shape shown above to "increase the light-gathering ability of the LED." *Id.* at 15–16 (quoting Ex. 1008 ¶¶ 15, 106); *see* Ex. 1003 ¶¶ 88–91. Petitioner contends that a person of ordinary skill in the art "making the design choice to prioritize improved improved light collection efficiency over reduced suseptibility to scratches could have readily modified Aizawa's cover to have a lens as per Inokawa." Pet. 16 (citing Ex. 1003 ¶ 91). Petitioner also contends that a skilled artisan would have had a reasonable expectation of success in combining those teachings. *Id.* at 15–16 (citing

IPR2021-00208
Patent 10,258,266 B1

Ex. 1003 ¶ 90). Petitioner adds that Aizawa's "transparent acrylic material . . . can be readily formed into a lens as in Inokawa." *Id.* at 16 (citing Ex. 1003 ¶ 91; Ex. 1009, 3:46–51, Fig. 1; Ex. 1023, Fig. 6, ¶¶ 22, 32, 35).

Petitioner provides annotated and modified versions of Aizawa's Figure 1(b) that depict the modification of the proposed combination, which are reproduced below. *Id.* at 15 (citing Ex. 1003 ¶ 89).



Petitioner's annotated figure on the left depicts the device with Aizawa's flat cover, wherein the annotated and modified figure on the right depicts the device resulting from the combination of Aizawa and Inokawa, in which a person of ordinary skill in the art would have replaced Aizawa's flat cover with a curved protrusion to "increase the light-gathering ability." *Id.* (quoting Ex. 1008 ¶ 15).

According to Petitioner, a person of ordinary skill in the art "would have understood how to implement Inokawa's lens[]in Aizawa's device with a reasonable expectation of success." Pet. 15–16 (citing Ex. 1003 ¶ 90). The shape of the modified cover in Dr. Kenny's illustration of the proposed modification above is similar to the shape of an LED lens illustrated in

IPR2021-00208
Patent 10,258,266 B1

Exhibit 1023 (hereafter "Nishikawa"),[5] referenced by Petitioner and
Dr. Kenny in in connection with the proposed ground of unpatentability.
*Compare* Pet. 15 (illustrating proposed modification), *with* Ex. 1023, Fig. 6,
¶¶ 3, 22, 30, 32, 35 (illustrating lens 50 used with LED 22, and discussing
how to make the illustrated device); *see also* Pet. 16 (citing Ex. 1023), 51–
52 (discussing teachings of Ex. 1023).

Petitioner also contends that, in the proposed modification, the convex
surface of the lens will cause the user's tissue to conform because the rigid
cover will be pressed against the user's skin with pressure. Pet. 28–30;
Ex. 1003 ¶¶ 92–93, 98; Ex. 1006 ¶¶ 6, 23, 26, 30, 34; Ex. 1008, Fig. 2.

Patent Owner's Arguments

Patent Owner contends that the evidence does not support Petitioner's
argument that it would have been obvious to modify Aizawa's cover to have
a lens with an outwardly protruding convex surface, in order to improve
detection efficiency by directing incoming light to Aizawa's
photodetectors 22, with a reasonable expectation of success. PO Resp. 16–
37; PO Sur-reply 2–13; Ex. 2004 ¶¶ 48–78.

According to Patent Owner, the evidence establishes that Petitioner's
proposed modification would direct light *toward the center* of Aizawa's
detector 1 where emitter 21 is located, rather than *toward the periphery*
where detectors 22 are located. PO Resp. 16–24; Ex. 2004 ¶¶ 48–65. Thus,
Patent Owner's view is that a person of ordinary skill in the art "would ***not***
have expected Inokawa's protruding surface to accomplish" the objective of
enhancing light collection efficiency relied upon by Petitioner, because

---

[5] U.S. Patent Application Publication No. 2007/0145255 A1, filed Dec. 20,
2006, published June 28, 2007 (Ex. 1023).

IPR2021-00208
Patent 10,258,266 B1

Petitioner's proposed modification instead "would direct light *away* from the *periphery*-located detectors" in Aizawa, the opposite result to Petitioner's contention.  PO Resp. 20; Ex. 2004 ¶¶ 42–43, 48–57.

In support, Patent Owner points to Inokawa's Figure 2, in which two arrows illustrate light that passes through the convex protrusion of lens 27 toward the center of Inokawa's pulse sensor 1 where detector 25 is located. PO Resp. 17–18 (citing Ex. 1008 ¶ 58); Ex. 2004 ¶¶ 51–52.  Patent Owner also points to the '266 patent's Figure 14B, which illustrates several light rays 1420, 1422 passing through a partially cylindrical protrusion 605 to be centrally focused on detector(s) 1410B.  PO Resp. 18–19 (citing Ex. 1001, 35:57–60, 35:67–36:2; Ex. 2004 ¶¶ 53–54).  Patent Owner cites portions of Dr. Kenny's deposition testimony that, in Patent Owner's view, support Patent Owner's contentions in these regards.  *See* PO Resp. 2–3, 16–18 (citing Ex. 2006, 83:15–84:2, 86:19–87:1, 108:21–109:14, 202:11–204:20).

Patent Owner also asserts that "Dr. Kenny admitted that the impact of Inokawa's convex lens would not be 'obvious' in the context of [the] different configuration of LEDs and detectors" presented by Aizawa. PO Resp. 20–21 (citing Ex. 2006, 87:2–6).  For example, Patent Owner points out that "light reaching Aizawa's detectors must travel in an opposite direction from the light in Inokawa."  *Id.* at 21–22 (Ex. 2004 ¶¶ 59–62).  In addition, according to Patent Owner, "Petitioner's combination is particularly problematic because" Aizawa uses "small detectors [22] with small openings [of cavities 23c] surrounded by a *large* amount of *opaque* material."  PO Resp. 22 (citing Ex. 1006, Fig. 1(a); Ex. 2004 ¶ 63).  In support of its view, Patent Owner cites portions of Dr. Kenny's deposition testimony.  *Id.* at 23 (citing Ex. 2006, 257:11–18).  Patent Owner also argues that to account for this, "Petitioner is forced to increase the size of Aizawa's

42

IPR2021-00208
Patent 10,258,266 B1

detectors approximately five-fold and eliminate Aizawa's large opaque barriers—with no analysis or explanation of such changes or the[ir] impact." *Id.* at 23–24 (citing Ex. 2004 ¶ 65).

Patent Owner further argues that Dr. Kenny, during his deposition, attempted to evade the foregoing problems by "disclaim[ing] Petitioner's reasoning [for obviousness] and assert[ing] new and improper opinions" that undermine the reasoning provided in the Petition. PO Resp. 24. For example, Patent Owner asserts that Dr. Kenny's attempt to distinguish between the '266 patent's Figure 14B as illustrating a lens that condenses *collimated* light toward the center, as compared to Aizawa and Inokawa in which the lens focuses *diffuse* light reflected by the user's body; Patent Owner argues this is not persuasive and is not supported by record evidence. PO Resp. 24–26 (citing Ex. 2006, 170:9–171:5; Ex. 2007, 288:13–289:5, 294:17–298:10, 298:11–299:18, 423:7–424:18; Ex. 2004 ¶¶ 67–68). Patent Owner also objects to Dr. Kenny's testimony that, "while a protruding surface would generally direct more light to the center," it "would also capture some light that otherwise would not be captured" by Aizawa's detectors 22, as lacking evidentiary support and relying on impermissible hindsight. PO Resp. 28–29 (citing Ex. 2004 ¶ 69–71; Ex. 2006, 204:21–206:5, 206:22–208:1; Ex. 2007, 294:17–298:10).

Patent Owner moreover asserts that "Dr. Kenny repeatedly distanced himself from his own similar combination" of Aizawa and Inokawa by refusing to talk about the specific shape, size, material, and dimensional tolerances of the combination, so, in Patent Owner's view, his testimony falls short because it demonstrates at most only that the references could have been combined. *Id.* at 2–3, 27–31 (citing, e.g., Ex. 2004 ¶¶ 71–73; Ex. 2006, 51:14–52:16, 75:20–77:2, 91:9–92:13, 96:20–21, 97:11–21,

IPR2021-00208
Patent 10,258,266 B1

100:17–101:18, 132:10–18, 154:4–7, 164:8–16, 189:11–190:3; Ex. 2007, 308:12–309:8, 310:18–311:9, 318:3–6, 324:21–325:19, 333:20–335:4).

Indeed, according to Patent Owner, because ordinary skill does not require specific education or experience with optics or optical physiological monitors (*see supra* Section II.C), "[i]t strains credibility that a [person of ordinary skill in the art] . . . could balance all of the factors Dr. Kenny identified" to reach the claimed invention. PO Resp. 31–32. Patent Owner relies on Dr. Kenny's testimony as establishing the complexity of designing optical physiological sensors. *Id.* at 3–4, 32–33 (citing Ex. 2006, 86:19–87:6; Ex. 2007, 331:19–332:11, 336:11–337:15). Patent Owner concludes Petitioner has failed to establish a reasonable expectation of success because Dr. Kenny's testimony "focuses almost entirely on manufacturing." *Id.* at 33 (citing Ex. 1003 ¶ 91; Ex. 2004 ¶ 75).

Patent Owner moreover asserts Petitioner errs in relying on Nishikawa as supporting the unpatentability of claim 1, because Nishikawa is "not identified as part of" the ground, which instead "includes only two references," Aizawa and Inokawa. PO Resp. 34 (citing Pet. 14; Ex. 1003 ¶¶ 86–91); *id.* at 35–36 (citing 35 U.S.C. § 312(a)(3); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016)). Patent Owner asserts Dr. Kenny "relies heavily" on Nishikawa, particularly "to inform the specific shape of the cover in his similar combination, which is found nowhere in Aizawa and Inokawa." *Id.* at 34–35 (citing Ex. 2004 ¶¶ 76–77; Ex. 2006, 179:21–180:13; Ex. 2007, 364:2–13; Ex. 2008, 73:8–12).

Furthermore, in Patent Owner's view, Dr. Kenny's reliance on Nishikawa "make[s] no sense" because "Nishikawa's device is not a physiological sensor" but rather is "an encapsulated LED" that "directs

IPR2021-00208
Patent 10,258,266 B1

*outgoing* light through the encapsulation material and thus focuses on the emission of light, not the detection of an optical signal." PO Resp. 36 (citing Ex. 1023, code (57), ¶¶ 3, 32, 35; Ex. 2004 ¶ 78). Patent Owner contrasts such disclosure with Aizawa and Inokawa, both of which "detect[] *incoming* light that passes through the cover and reaches the detectors," and which have a "drastically" smaller scale than Nishikawa's LEDs. *Id.* at 36–37 (citing Ex. 1008, Fig. 2; Ex. 2004 ¶ 78).

Petitioner's Reply

In reply, Petitioner insists "Inokawa's lens enhances the light-gathering ability of Aizawa," which would have motivated an ordinarily skilled artisan "to incorporate 'an Inokawa-like lens [having a protrusion] into the cover of Aizawa to increase the light collection efficiency.'" Pet. Reply 2–3 (citing Pet. 13–15; Ex. 1003 ¶¶ 86–89; Ex. 1008, Fig. 2, ¶¶ 15, 58). Petitioner dismisses Patent Owner's and Dr. Madisetti's opposition as being "misinformed" because a person of ordinary skill in the art "would understand that Inokawa's lens generally improves 'light concentration at pretty much all of the locations under the curvature of the lens,' as opposed to only at a single point at the center." *Id.* at 3 (quoting Ex. 2006, 164:8–16); Ex. 1047 ¶¶ 7–9.

For example, Petitioner contends that Patent Owner and Dr. Madisetti "ignore[] the well-known principle of reversibility," by which "a ray going from P to S will trace the same route as one from S to P." Pet. Reply 4

(underlining omitted) (citing, e.g., Ex. 1052,[6] 84, 87–92); Ex. 1047 ¶¶ 10–
22.  Petitioner contends that Dr. Madisetti was evasive when he was asked to
apply the reversibility principle to the combination of Aizawa and Inokawa
in this case.  Pet. Reply 6 (citing Ex. 1034, 89:12–19).  Petitioner further
contends that, "based at least on the principle of reversibility," one of
ordinary skill in the art "would have understood that both configurations of
LEDs and detectors—i.e., with the LED at the center as in Aizawa or with
the detector at the center as in Inokawa—would similarly benefit from the
enhanced light-gathering ability of an Inokawa-like lens."  *Id.* at 9 (citing
Ex. 1047 ¶ 22).

Petitioner also asserts that Patent Owner and Dr. Madisetti overlook
the fact that light rays reflected by body tissue in the user's wrist, to be
received by detectors in either Aizawa's or Inokawa's pulse sensor, will be
"scattered" and "diffuse" and, therefore, will approach the detectors "from
various random directions and angles."  Pet. Reply 9–10, 13 (annotating
Inokawa's Fig. 2 to illustrate the cause and nature of the back-scattering);
Ex. 1047 ¶¶ 23–26.  This scattered and diffuse light, according to Petitioner,
means that Inokawa's "lens cannot focus all incoming light toward the
sensor's center," as Patent Owner would have it.  Pet. Reply 9 (citing
Ex. 1047 ¶ 23; Ex. 2006, 163:12–164:2).  Petitioner asserts this is due to

---

[6]  Eugene Hecht, *Optics* (2nd ed. 1990).  It is apparent that the page
numbering identified by Petitioner for Exhibit 1052 refers to the documents
native page numbering and not the page numbering of the exhibit appearing
at the bottom, middle of each page.  For clarity and consistency, in this
Decision, we also refer to the same page numbering as Petitioner for Exhibit
1052.

IPR2021-00208
Patent 10,258,266 B1

Snell's law, and provides several illustrations to illustrate why. *Id.* at 9–15 (citing, *e.g.*, Ex. 1047 ¶¶ 23–34).

Due to the random nature of this scattered light, Petitioner explains that one of ordinary skill in the art would have understood that a convex cover "provides a slight refracting effect, such that light rays that may have missed the detection area are instead directed toward that area." Pet. Reply 10 (citing Ex. 1047 ¶¶ 25–26). Petitioner applies this understanding to Aizawa, and contends that using a lens with a convex protrusion in Aizawa would "enable backscattered light to be detected within a circular active detection area surrounding" a central light source. *Id.*

Moreover, Petitioner dismisses the applicability of Figure 14B of the '266 patent as illustrating the operation of a *transmittance*-type of sensor that measures the attenuation of collimated light transmitted through the user's body tissue, rather than the *reflectance*-type sensor of Aizawa. *Id.* at 11–13 (citing, *e.g.*, Ex. 1001, 35:65–67; Ex. 1047 ¶¶ 27–31).

Petitioner further maintains that Patent Owner's argument that Petitioner's illustrations of the light-focusing properties of a convex lens discussed in the Petition filed in IPR2020-01520 (Ex. 2019, 39) and relied upon by Dr. Kenny (Ex. 2020, 119–120) does not demonstrate "that a convex lens directs all light to the center." Pet. Reply 15 (citing PO Resp. 16–18). Petitioner contends these illustrations, instead, "are merely simplified diagrams included to illustrate . . . one example scenario (based on just one ray and one corpuscle) where a light permeable cover can 'reduce a mean path length of light traveling to the at least four detectors'" as recited in a claim challenged in that proceeding. *Id.* (citing, *e.g.*, Ex. 1047 ¶ 34).

47

IPR2021-00208
Patent 10,258,266 B1

Patent Owner's Sur-reply

Patent Owner asserts that Petitioner's Reply improperly presents several new arguments, relying on new evidence, as compared with the Petition. *See, e.g.*, PO Sur-reply 1 ("new optics theories" and "new arguments"), 2, 6, 7, 9, 10, 12, 13.

Patent Owner also contends that Petitioner mischaracterizes Patent Owner's position, which is not that Inokawa's lens with a convex protrusion "would direct '***all***' light 'only at a ***single point*** at the center'" of the sensor. *Id.* at 2, n.2 (quoting Pet. Reply 3; citing, e.g., Ex. 2027, 63:7–64:6, 94:20–96:1, 96:18–97:7). Patent Owner's position, rather, is that Inokawa's lens condenses more light (not necessarily all light) "***towards the center*** of the sensor" as compared to a flat surface. *Id.* at 2 (quoting PO Resp. 19; citing, e.g., Ex. 2004 ¶¶ 34, 43, 49, 51–52, 54–55, 67).

Patent Owner moreover asserts "[t]here can be no legitimate dispute that a convex surface directs light centrally (and away from the periphery)." PO Sur-reply 3–6 (citing PO Resp. 16–19; Ex. 2006, 164:8–16, 166:10–17, 170:22–171:5; Ex. 2020 ¶¶ 119, 200; Ex. 2027, 181:9–182:5). Patent Owner contends that Petitioner's argument "that Inokawa would improve light-gathering at all locations, ***regardless*** of the location of the LEDs and detectors" is belied by Dr. Kenny's testimony that "Inokawa's benefit would ***not*** be clear if Inokawa's LEDs and detectors were moved" and "confirmed that a convex surface would direct light toward the center of the underlying sensor." *Id.* at 5–6 (citing Pet. Reply 3–4; Ex. 2006, 86:19–87:6, 202:11–204:20).

Patent Owner argues that Petitioner's discussion of the principle of reversibility is "irrelevant" because it "assumes ideal conditions that are not present when tissue scatters and absorbs light." PO Sur-reply 6–8 (citing

IPR2021-00208
Patent 10,258,266 B1

Ex. 2027, 17:12–19:2, 29:11–30:7, 31:8–32:3, 38:17–42:6, 207:9–209:21, 210:8–211:6). The random nature of backscattered light, in Patent Owner's view, "hardly supports Petitioner's argument that light will necessarily travel the same paths regardless of whether the LEDs and detectors are reversed," and is irrelevant to the central issue presented here of "whether a convex surface—*as compared with a flat surface*—would collect and focus additional light on Aizawa's peripherally located detectors." *Id.* at 8–9 (citing Ex. 2027, 212:3–14).

Patent Owner also argues that Petitioner's position that a convex cover will provide a "*slight*" refracting effect, "directly undermines Petitioner's provided *motivation* to combine," i.e., to enhance light collection efficiency. *Id.* at 10–11.

Analysis

Upon review of the foregoing, we conclude that a preponderance of the evidence supports Petitioner's view that it would have been obvious to modify Aizawa's cover 6 to include a lens with a single outwardly protruding convex surface like that taught in Inokawa, in order to increase the amount of backscattered light that will be received by Aizawa's four peripheral detectors 22, as compared with Aizawa's existing flat cover.

It is clear that Aizawa's and Inokawa's pulse sensors both gather data by emitting light into the user's wrist tissue, and collecting light that reflects back to the sensor from the user's tissue. *See, e.g.*, Ex. 1006, Figs. 1(b), 2 (sensor 2 has emitter 21 and four detectors 22, all facing a user's wrist 10); Ex. 1008, Figs. 1, 2 (sensor 1 has two emitters 21, 23 and one detector (photodiode 25), all facing the user's wrist when held in place by wristband 5). Dr. Kenny testifies, and Patent Owner agrees, that the

IPR2021-00208
Patent 10,258,266 B1

reflection of this light by the user's wrist tissue randomizes the propagation direction of the reflected light rays. *See* Ex. 1047 ¶¶ 12, 14–17, 23; Ex. 2020 ¶ 128; PO Sur-reply 7 ("Even Petitioner admits that tissue randomly scatters and absorbs light rays . . . ."). This reflection principle is illustrated by Dr. Kenny's annotations to Inokawa's Figure 2 reproduced below:



Here, Dr. Kenny has modified Inokawa's Figure 2 (1) by removing two black arrows, (2) by coloring Inokawa's light detector in red and Inokawa's two light emitters in green, and (3) by adding several green arrows to illustrate the various directions that light rays may be directed after impinging on and reflecting off different tissues in the user's wrist. Ex. 1047 ¶ 32.

This randomized direction of reflected light rays results in backscattered light that is diffuse, rather than collimated, in nature. Figure 4.12 of Exhibit 1052 illustrates the difference between diffuse and collimated light, and is reproduced below:

IPR2021-00208
Patent 10,258,266 B1



This figure provides at left a photograph and an illustration showing incoming collimated light reflecting from a smooth surface, and at right a photograph and an illustration of incoming collimated light reflecting from a rough surface. *See* Ex. 1052, 87–88. The smooth surface provides specular reflection, in which the reflected light rays are collimated like the incoming light rays. *See id.* The rough surface provides diffuse reflection, in which the reflected light rays travel in random directions. *See id.*

This diffuse nature of the light reflected from the user's wrist tissue, which both Aizawa and Inokawa aim to collect to generate pulse data, suggests that a lens might be useful to increase the amount of collected light and thereby increase the reliability of the pulse data generated using the collected light. Indeed, that is taught by Inokawa. Inokawa describes using its lens 27 to "increase the light-gathering ability" of Inokawa's light photodiode or detector 25.[7] Ex. 1008 ¶¶ 15, 58. Furthermore, there is also no dispute that Inokawa's lens 27 is understood to be shaped to include a

---

[7] Although Inokawa refers to the "LED" such as emitters 21, 23 in that regard (Ex. 1008 ¶ 15), rather than photodiode 25, it is undisputed that photodiode 25 is the only component of Inokawa's sensor 1 that gathers light.

IPR2021-00208
Patent 10,258,266 B1

single convex protruding surface. *See, e.g.*, Ex. 1003 ¶¶ 87–88 (characterizing Inokawa as teachings a "convex protrusion that acts as a lens"); PO Resp. 1 (describing Inokawa as teaching a "convex lens"). Thus, Inokawa demonstrates that it was known in the art to use a lens comprising a protrusion to focus diffuse light reflected from body tissue on to the light detecting elements of a wrist-worn pulse sensor, and to increase the light gathered by the sensor thereby improving the device's calculation of the user's pulse.

A preponderance of the evidence supports Petitioner's view that it would have been obvious for a person of ordinary skill in the art to apply Inokawa's lens technology to Aizawa's wrist-worn pulse sensor, to similarly improve its light collection as compared to Aizawa's existing flat cover. That is illustrated by the following illustrations provided by Dr. Kenny:



The illustration at left modifies Aizawa's Figure 1(b) to color Aizawa's emitter in green, its detectors in red, and Aizawa's existing flat cover in blue; the illustration on the right includes Aizawa's Figure 1(b) with the same color coding, but wherein the flat cover is modified to incorporate a convex protrusion that covers Aizawa's peripheral light detectors and central light emitter. *See* Ex. 1003 ¶ 89. We are persuaded by Dr. Kenny's testimony that Snell's law indicates that "light rays that may have otherwise missed the detection area are instead directed toward that area as they pass

IPR2021-00208
Patent 10,258,266 B1

through the interface provided by the cover," and is especially true "in configurations like Aizawa's in which light detectors are arranged symmetrically about a central light source, so as to enable backscattered light to be detected within a circular active detection area surrounding that source." Ex. 1047 ¶ 26; *see also id.* ¶¶ 23–26.

Patent Owner correctly notes that Inokawa's single detector 25 is located in the central portion of Inokawa's sensor 1, whereas Aizawa's four detectors 22 are located towards the periphery of Aizawa's sensor 2. *Compare* Ex. 1008, Fig. 2, *with* Ex. 1006, Figs. 1(a)–1(b). Nevertheless, Petitioner's proposed modification of Aizawa takes that arrangement into account, as can be seen by the following comparison between Inokawa's sensor and Petitioner's proposed modification of Aizawa's sensor:



The illustration at left annotates Inokawa's Figure 2 to identify the central detector in red and the lens in blue (*see* Ex. 1003 ¶ 87), and the illustration at right annotates Petitioner's proposed modification of Aizawa to illustrate the peripheral detectors in red and the lens in blue (*see id.* ¶ 89). As can be seen, the lenses are not identical. In Inokawa the lens's curvature is most pronounced at the center of the lens near the central detector, and in the proposed modification to Aizawa, the lens's curvature is most pronounced at the edges of the lens near the peripheral detectors. Thus, Dr. Kenny's proposed modification of Aizawa takes Inokawa's general teaching of using

a convex protrusion lens to increase the amount of incoming light directed to a light detector, and applies it to the light detectors of Aizawa. *See, e.g.*, Ex. 1003 ¶ 88 ("[B]ecause the path of light is reversible, the light collection function of Inokawa's lens would work the same way regardless of whether light is emitted toward the center (and detected by a centrally located photodiode) or emitted away from the center (and detected by a peripherally located photodiode)."), 90 ("That is, depending on the desired objective of the user (e.g., less scratches or improved light-gathering), the shape of the cover can be readily modified."), 91 ("[T]o achieve the goal of improving light collection efficiency, which both Aizawa and Inokawa share, a [person of ordinary skill in the art] would have been able to, with a reasonable expectation of success, modify Aizawa's light permeable cover to include a lens as taught by Inokawa."); Ex. 1047 ¶¶ 7–34.

We are cognizant of Patent Owner's contention that Petitioner's ground "improperly" relies upon a reference, Nishikawa, that was not identified as a part of the ground of unpatentability. PO Resp. 34. As Patent Owner observes, Dr. Kenny characterizes his testimony as being "***inspired*** by" or "motivated" in part based on Nishikawa's disclosure when it comes to the shape of a convex lens. *See, e.g.*, PO Resp. 34–35 (citing, e.g., Ex. 2007, 364:2–13; Ex. 2008, 73:8–12). We, however, disagree with Patent Owner that any impropriety arises from Dr. Kenny's contemplation of the teachings of Nishikawa in connection with the shape of a lens for a physiological sensor. The nature of Petitioner's and Dr. Kenny's consideration of Nishikawa is explained in cited portions of Dr. Kenny's declaration, even if Nishikawa is not listed as a third reference in the identification of the ground. *See* Ex. 1003 ¶ 91 ("[M]any prior art references of this period, such as Nishikawa (shown below) demonstrate exactly how

IPR2021-00208
Patent 10,258,266 B1

such a lens shape [as taught by Inokawa] may be incorporated into a molded cover."); Pet. 16–17. Indeed, it follows readily from the Petition that a skilled artisan would have appreciated that Nishikawa's teachings provide insight as to how "the transparent acrylic material used to make Aizawa's plate can be readily formed into a lens as in Inokawa." Pet. 16. Nishikawa describes how its "lens unit 50" can be a transparent resin formed in the shape illustrated in Figure 6 by injection molding. Ex. 1023 ¶¶ 22, 32, 35. Dr. Kenny also explains that Nishikawa's lens shape design "is intended to provide curvature in the lens where it can do the most good and otherwise try to avoid excess use of material in order to create curvature in locations where it wouldn't do any good." Ex. 2006, 179:21–180:13.

Moreover, we observe that a rejection based on obviousness "require[s] an analysis that reads the prior art in context, taking account of 'demands known to the design community,' 'the background knowledge possessed by a person having ordinary skill in the art,' and 'the inferences and creative steps that a person of ordinary skill in the art would employ.'" *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (quoting *KSR*, 550 U.S. at 418). Furthermore, record evidence can be useful to "demonstrate the knowledge and perspective one of ordinary skill in the art." *Id.*; *see also Ariosa Diagnostics v. Verinata Health Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015) ("Art can legitimately serve to document the knowledge that skill artisan would bring to bear in reading the prior art identified as producing obviousness.").

As noted above, Dr. Kenny makes clear that his view as to obviousness of the claims of the '266 patent was "inspired by" or "motivated" in part by Nishikawa's teachings as to shapes generally known to those in the art of manufacturing a lens. *See, e.g.*, Ex. 2007, 364:2–13;

IPR2021-00208
Patent 10,258,266 B1

Ex. 2008, 73:12–21.  We conclude that the record establishes that Nishikawa's teachings are representative of background knowledge of one of ordinary skill in the art and provide context and perspective of a skilled artisan as to the type of shapes available for a convex protruding surface, such as that disclosed in Inokawa.  That Dr. Kenny considered record evidence cited in the Petition as informing his view of what a skilled artisan would understand as to known types of lens shapes does not establish, in our view, any impropriety as part of that ground.

Patent Owner additionally asserts, and Dr. Madisetti testifies, that Petitioner's combination of Aizawa and Inokawa is "problematic" because it overlooks the "small" size of Aizawa's detectors 22 and the openings or cavities 23c in which they are housed.  *See* PO Resp. 22 (citing Ex. 1006, Fig. 1(a); Ex. 2004 ¶ 63).  Patent Owner, however, does not articulate what significance the size of Aizawa's detector components have in the obviousness evaluation based on the teachings of the prior art.

We additionally do not agree with Patent Owner's argument that Petitioner's Reply presents new arguments and evidence that should have been first presented in the Petition.  The Petition proposed a specific modification of Aizawa to include a convex protrusion in the cover, for the purpose of increasing the light gathering ability of Aizawa's device.  *See, e.g.*, Pet. 13–17.  Patent Owner, in its Response, then challenged that contention with several arguments that Petitioner's proposed convex protrusion would not operate in the way the Petition alleged.  *See, e.g.*, PO Resp. 16–37.  In its Reply, Petitioner provided arguments and evidence attempting to rebut the contentions in the Patent Owner Response.  *See*

IPR2021-00208
Patent 10,258,266 B1

PTAB Consolidated Trial Practice Guide (Nov. 2019),[8] 73 ("A party also may submit rebuttal evidence in support of its reply."). The Reply does not change Petitioner's theory for obviousness; rather, the Reply presents more argument and evidence in support of the same theory for obviousness presented in the Petition. *Compare* Pet. 13–17, *with* Pet. Reply 2–15.

Patent Owner finally argues that a conclusion of obviousness "strains credibility" because the level of ordinary skill in the art (*see supra* Section II.C) does not require specific education or experience with optics or optical physiological monitors. *See, e.g.*, PO Resp. 31–32. We disagree. Concerning motivation, an ordinarily skilled artisan would have readily appreciated from the record at hand that: (1) Aizawa's detector 1 operates by gathering light data with its photodetectors 22; (2) a lens was known to focus the light on photodetectors; and (3) optical lenses may be formed by providing a convex protrusion in the lens to focus light. Indeed, Inokawa discloses such utility, function, and structure as a part of its convex lens. *See, e.g.*, Ex. 1008 ¶¶ 15, 58, Fig. 2. We are persuaded that a person of ordinary skill in the art would have understood these general concepts of optics.

Concerning reasonable expectation of success, we rely on Dr. Kenny's testimony that a person of ordinary skill in the art would have "would have sought to incorporate a convex, lens structure as in Inokawa into Aizawa's acrylic plate to thereby increase light collection efficiency, in turn leading to more reliable pulse wave detection," "would have further understood *how* to" do so, "depending on the desired objective of the user,"

---

[8]  Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

and would have enjoyed a reasonable expectation of success in doing so. Ex. 1003 ¶¶ 88, 90–91; Ex. 2006, 179:21–180:13, 202:11–20.

Thus, we conclude that one of ordinary skill in the art would have had adequate reason to replace Aizawa's flat cover 6 with a cover comprising a convex protrusion, to improve light detection efficiency, and would have had a reasonable expectation of success in doing so.

### vi.     Summary

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 1 would have been obvious over the cited combination of references.

### 4.     Independent Claim 9

Independent claim 9 consists of limitations that are substantially similar to limitations [a]–[d] of claim 1. *Compare* Ex. 1001, 44:37–54, *with id.* at 45:13–23 (reciting "a housing" as opposed to "a circular housing including a planar surface"; "at least four detectors" as opposed to "at least four detectors arranged on the planar surface" and "the four detectors are arranged in a grid pattern"; "a lens" as opposed to "a lens forming a cover" and omitting details of the lens' location; the sensor is "worn by the user" as compared to omitting details regarding user wear).

In asserting that claim 9 also would have been obvious over the combined teachings of Aizawa and Inokawa, Petitioner refers to the same arguments presented as to claim 1 (Pet. 35–36, 39 ("*See supra* Ground 1A")) and also presents additional arguments corresponding to the claimed "circular housing," "planar surface," and "grid pattern" limitations (Pet. 36–39). Specifically, Petitioner presents modified and annotated Figures 1(a)

IPR2021-00208
Patent 10,258,266 B1

and (1b) of Aizawa (reproduced below) to demonstrate the claimed circular
housing and planar surface.



Annotated Figure 1(a) (left) depicts pulse wave sensor 2 comprising
holder 23 with detectors 22 arranged in a standard north, south, east, west
grid pattern (depicted in blue). Pet. 38. The circular shape of the holder is
highlighted in green. *Id*. Annotated Figure 1(b) (right) depicts pulse wave
sensor 2 comprising holder 23 (labeled in green text as "Circular housing").
Pet. 36. The holder is adjacent to a surface, highlighted in brown, that
Petitioner equates to the claimed "planar surface." *Id*.

Patent Owner does not present any argument for these claims other
than those we have already considered with respect to independent claim 1
and our claim construction analysis above. PO Resp. 12–43.

For the same reasons discussed above, we determine that Petitioner
has met its burden of demonstrating by a preponderance of the evidence that
claim 9 would have been obvious over the cited combination of references.
*See supra* II.D.3.i–v; Ex. 1003 ¶¶ 106–113.

### 5. *Dependent Claims 2–6, 8, 10–16, 18, and 19*

Petitioner presents undisputed contentions that claims 2–6, 8, 10–16,
18, and 19, which depend directly or indirectly from independent claim 1 or

IPR2021-00208
Patent 10,258,266 B1

9, are unpatentable over the combined teachings of Aizawa and Inokawa, and provides arguments explaining how the references teach the limitations of these claims. Pet. 30–35, 39–44; Ex. 1003 ¶¶ 94–105, 114–124.

Patent Owner does not present any arguments for these claims other than those we have already considered with respect to independent claim 1. PO Resp. 43 ("The Petition fails to establish that independent claims 1 and 9 would have been obvious . . . and thus fails to establish obviousness as to any of the challenged dependent claims.") (citing Ex. 2004 ¶ 89).

We have considered the evidence and arguments of record and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2–6, 8, 10–16, 18, and 19 would have been obvious over the combined teachings of the cited references and as supported by the testimony of Dr. Kenny.

### E.   Obviousness over the Combined Teachings of Mendelson-1988 and Inokawa

Petitioner contends that claims 1–6, 8–16, 18, and 19 of the '266 patent would have been obvious over the combined teachings of Mendelson-1988 and Inokawa. Pet. 47–71.

### 1.   Overview of Mendelson-1988 (Ex. 1015)

Mendelson-1988 discloses a pulse oximeter, with an optical reflectance sensor suitable for noninvasive monitoring of a user's arterial hemoglobin oxygen saturation ($SpO_2$), via the user's forehead. *See* Ex. 1015, 167 (title & abstract). Figure 2 is reproduced below:

IPR2021-00208
Patent 10,258,266 B1



Figure 2 illustrates the sensor of Mendelson-1988, including: (A) a top view diagram; (B) a side view diagram; and (C) a photograph. *Id.* at 169.

The sensor includes two red LEDs and two infrared LEDs for emitting light into the user's tissue, and six photodiodes "arranged symmetrically in a hexagonal configuration" surrounding the four emitters, to detect light reflected back to the sensor from the user's tissue. *Id.* at 168 ("SENSOR DESIGN"). The user's "$SpO_2$ can be calculated from the ratio of the reflected red and infrared photoplethysmograms." *Id.* at 167. "To minimize the amount of light transmission and reflection between the LEDs and the photodiodes within the sensor, a ring-shaped, optically opaque shield of black Delrin . . . was placed between the LEDs and the photodiode chips." *Id.* at 168 (col. 2). "The optical components were encapsulated inside the package using optically clear adhesive." *Id.* "The microelectronic package was mounted inside a black Delrin housing." *Id.*

61

## 2.  Independent Claim 1

### i.  "A noninvasive optical physiological sensor comprising"

The cited evidence supports Petitioner's undisputed contention that Mendelson-1988 discloses a noninvasive optical physiological sensor, i.e., an "optical reflectance sensor" that monitors "arterial hemoglobin oxygen saturation [SpO$_2$]," a physiological parameter of the wearer.  Pet. 52; *see, e.g.*, Ex. 1015, Abstract, 167, 172; Ex. 1003 ¶ 130.

### ii.  *"[a] a plurality of emitters configured to emit light into tissue of a user"*

The cited evidence supports Petitioner's undisputed contention that Mendelson-1988 discloses two red LEDs and two infrared LEDs that emit light into user tissue.  Pet. 52–53; *see, e.g.*, Ex. 1015, 168 ("The optical reflectance sensor used in this study consists of two red (peak emission wavelength: 660 nm) and two infrared (peak emission wavelength: 930 nm) LED chips.")), Fig. 2(a); Ex. 1003 ¶ 131.

### iii.  *"[b] a plurality of detectors configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprise at least four detectors"*

The cited evidence supports Petitioner's undisputed contention that Mendelson-1998 discloses "six silicon photodiodes . . . arranged symmetrically in a hexagonal configuration" on the sensor.  Pet. 53–54; *see, e.g.*, Ex. 1015, 168–169, Figs. 2(A)–(B).  Mendelson-1998 discloses that the photodiodes output "current pulses" indicative of a physiological parameter of the wearer in response to light emitted by the emitters and reflected from the skin.  Pet.52; *see, e.g.*, Ex. 1015, 167 ("SpO$_2$ can be calculated from the

IPR2021-00208
Patent 10,258,266 B1

ratio of the reflected red and infrared photoplethysmograms."); Ex. 1003 ¶ 132.

> iv.     *"[c] a housing configured to house at least the plurality of detectors"*

The cited evidence supports Petitioner's contention that Mendelson-1988 discloses an AIRPAX package, i.e., a housing in which the detectors are located. Pet. 54; Ex. 1015, 168. Petitioner's annotated version of Mendelson-1988's Figures 2B is reproduced below.



Pet. 54. The modified figure depicts a side view of Mendelson-1988's sensor with a housing (depicted in red) in which the detectors (depicted in green) are located. *Id.*; Ex. 1003 ¶ 133.

> v.     *"[d] a lens configured to be located between the tissue of the user and the plurality of detectors when the noninvasive optical physiological sensor is worn by the user, wherein the lens comprises a single outwardly protruding convex surface configured to cause tissue of the user to conform to at least a portion of the single outwardly protruding convex surface when the noninvasive optical physiological*

IPR2021-00208
Patent 10,258,266 B1

> *sensor worn by the user and during operation of the*
> *noninvasive optical physiological sensor."*

Petitioner's Contentions

Petitioner contends that Mendelson-1988's sensor discloses a light permeable cover, i.e., the "OPTICALLY CLEAR EPOXY" in Figure 2B, that covers the detectors and is located between the user's tissue and the detectors when worn.  Pet. 47–48, 55–56; Ex. 1003 ¶¶ 67, 134–143. Petitioner states that Mendelson-1998 does not provide further details, such as the "precise shape of this layer's interface with the skin."  Pet. 48–49; Ex. 1003 ¶ 135.  As discussed above in Section II.D.3, Petitioner contends that Inokawa's sensor includes lens 27 positioned over light detector 25. Pet. 49.  Petitioner reasons that an ordinarily skilled artisan would have been motivated, with a reasonable expectation of success, to modify Mendelson-1988's optical SpO$_2$ sensor, in light of Inokawa's optical pulse sensor, by adding a lens with a single outwardly protruding convex surface to Mendelson-1988's cover to improve the sensor's light detection efficiency.  *Id.* at 49–50.

Dr. Kenny provides the following illustrations to portray the proposed modification of Mendelson-1988's sensor (Ex. 1003 ¶¶ 138–139):



IPR2021-00208
Patent 10,258,266 B1

At the left, Dr. Kenny has excerpted and annotated Mendelson-1988's Figure 2B, to identify the pre-existing cover (colored blue) which covers the light emitters and detectors. *See id.* At the right, Dr. Kenny has illustrated the device resulting from the proposed modification of the cover to have a single convex protrusion (also colored blue). *See id.*

Petitioner adds that a person of ordinary skill in the art would have had a reasonable expectation of success in implementing Inokawa's lens structure in Mendelson-1998, and that the modification would have "require[d] only routine knowledge of sensor design and assembly." Pet. 51; Ex. 1003 ¶ 140. For example, Petitioner contends that prior art such as Nishikawa[9] demonstrates that "molding clear epoxy, as in Mendelson-1988, into a lens was well understood." Pet. 51 (citing Ex. 1023, Fig. 6, ¶¶ 22, 32, 35; Ex. 1003 ¶ 141). Indeed, Petitioner notes that Mendelson-1998 and Nishikawa utilize the same material, which "can have the same index of refraction, and, as such, the interface between the encapsulation portion and the lens portion will not adversely affect the optical performance of the modified system." *Id.* at 51–52 (citing Ex. 1023 ¶ 37; Ex. 1003 ¶ 142).

Finally, Petitioner contends that "[a]ttaching a rigid device," as suggested by the proposed combination of Mendelson-1998 and Inokawa, "in such a manner will cause at least some deformation of the tissue to occur because the skin is more pliable than the cover," such that the modified sensor and lens "acts to further deform the tissue of the user around the convex surface of the lens when the device is pressed against the tissue." Pet. 56; Ex. 1003 ¶ 143.

---

[9] U.S. Patent Application Publication No. 2007/0145255 A1, filed Dec. 20, 2006, published June 28, 2007 (Ex. 1023).

IPR2021-00208
Patent 10,258,266 B1

## Patent Owner's Arguments

Patent Owner is of the view that Petitioner has not met its burden to demonstrate the obviousness of modifying Mendelson-1988's sensor in light of Inokawa to have a protrusion, based on substantially the same analysis and testimony discussed above in the context of combining Aizawa and Inokawa. *See* PO Resp. 47–51; Ex. 2004 ¶¶ 98–109; *supra* Section II.D.3.v. For example, Patent Owner argues that Mendelson-1988, like Aizawa, provides central emitters surrounded by several peripherally located detectors. *Compare* Ex. 1015, 169 (Fig. 2) (showing four central LEDs surrounded by six photodiodes), *with* Ex. 1006, Figs. 1(a)–1(b) (showing one central LED 21 surrounded by four photodetectors 22); PO Resp. 47. Given this arrangement, Patent Owner reiterates its argument that the proposed combination in view of Inokawa would direct light away from the peripheral detectors, and toward the center of the sensor, thereby diminishing the received signal. PO Resp. 49–51.

Additionally, and as discussed above in the context of combining Aizawa and Inokawa, Patent Owner argues that Petitioner improperly relies upon Nishikawa's teachings, although Nishikawa is not identified as part of the asserted ground of unpatentability. PO Resp. 55–57.

## Petitioner's Reply

Petitioner incorporates its contentions as set forth regarding the proposed combination of Aizawa and Inokawa, and responds that Dr. Kenny's consideration of Nishikawa was proper, as providing further support for the proposed combination. Pet. Reply 22–23, 26–27.

IPR2021-00208
Patent 10,258,266 B1

Patent Owner's Sur-reply

Patent Owner's Sur-reply generally reiterates its arguments challenging Petitioner's contentions.  PO Sur-reply 20–24.

Analysis

As an initial matter, we find that a preponderance of the evidence establishes that the Mendelson-1988 sensor's optically clear epoxy is a light permeable cover that is arranged above a portion of the housing and covers the sensor's detectors.  In particular, it is clear from Figures 2A and 2B that the epoxy extends from the top of the sensor at the dotted line in the figure, down into the well of the AIRPAX package, to cover all four LEDs and all six photodiodes disposed at the bottom of the well.  *See also* Ex. 1015, 168 ("The optical components were encapsulated inside the package using optically clear adhesive").

We also conclude that a preponderance of the evidence supports Petitioner's contention that it would have been obvious to modify the top surface of Mendelson-1988's cover to include a lens including a single convex protruding surface, in order to increase the amount of backscattered light that will be received by Mendelson-1988's peripheral detectors.  Our reasoning is substantially identical to the analysis provided above in connection with the ground based on Aizawa and Inokawa, with Mendelson-1988 replacing Aizawa in the combination.  *See supra* Section II.D.3.  Patent Owner does not cite, and we do not discern, any material difference between Mendelson-1988 and Aizawa that might lead to a different result here.  For the reasons discussed in Section II.D.3, we do not agree with Patent Owner's arguments that the proposed combination

IPR2021-00208
Patent 10,258,266 B1

would result in a diminished sensor signal, or that Petitioner improperly relied upon Nishikawa.

### vi.    Summary

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 1 would have been obvious over the cited combination of references.

### 3.    Independent Claim 9

Independent claim 9 consists of limitations that are substantially similar to limitations [a]–[d] of claim 1. *Compare* Ex. 1001, 44:37–54, *with id.* at 45:13–23 (reciting "a housing" as opposed to "a circular housing including a planar surface"; "at least four detectors" as opposed to "at least four detectors arranged on the planar surface" and "the four detectors are arranged in a grid pattern"; "a lens" as opposed to "a lens forming a cover" and omitting details of the lens' location; the sensor is "worn by the user" as compared to omitting details regarding user wear).

Petitioner's Contentions

With respect to the "circular housing having a planar surface" requirement, Petitioner points to Mendelson's Figures 2(A) and 2(B) and contends that "Mendelson-1988 discloses that its LEDs and photodiode chips (i.e., emitters and detectors) are mounted on a ceramic substrate (*planar surface*) and housed within an AIRPAX microelectronic package (*housing*)." Pet. 64. Petitioner, however, characterizes the housing shown in those figures, specifically Figure 2(A) as "appear[ing] to have a square shape, not a circular one." *Id.* Petitioner reasons that "[a person of ordinary skill in the art] would have recognized that microelectronic packaging as

68

used in Mendelson-1988 comes in various shapes and sizes" and "[a person of ordinary skill in the art] would have considered using a differently shaped housing, namely a circular one, to be obvious." *Id.* at 64–65 (citing Ex. 1003 ¶ 162). Petitioner also contends that employing a circular housing was "common practice" prior to the '266 patent, and that "there was nothing new or inventive about changing one housing shape for another." *Id.* at 65 (citing Ex. 1003 ¶ 162). Petitioner explains that its contentions are evidenced by another reference of record, Mendelson '799. *Id.*

Patent Owner's Arguments

Patent Owner characterizes Petitioner's proposed ground for claim 9 as "facially deficient" for several reasons: (1) "[t]he Petition never identifies a motivation to pick a circular-shaped housing instead of the existing square shape"; (2) "[a person of ordinary skill in the art] would have no particular motivation to change the shape unless a [person of ordinary skill in the art] perceived some benefit in doing so"; (3) "Mendelson '799 does not disclose a cover (or even epoxy encapsulation) and thus cannot disclose a circular housing and a cover of the circular housing, as claim 9 requires"; and (4) "Petitioner did not include Mendelson '799 in any ground." PO Resp. 53–55 (citing Ex. 2004 ¶¶ 118–119).

Petitioner's Reply

In response to Patent Owner's arguments, Petitioner replies that "references like Mendelson [']799 have a circular housing and confirm the notion that a [person of ordinary skill in the art] would have found it to be simply a matter of design choice to use different shapes." Pet. Reply 25–26 (citing Ex. 1003 ¶¶ 160–162; Ex. 1025, Fig. 7, 9:34–36; Ex. 1047 ¶ 53).

IPR2021-00208
Patent 10,258,266 B1

Petitioner also contends "neither the '266 patent nor [Patent Owner] provides any explanation of how the particular housing shape solves some problem or presents some unexpected result." *Id.* at 26 (citing *In re Kuhle*, 526 F.2d 553, 555 (CCPA 1975)).

Patent Owner's Sur-reply

Patent Owner responds that "Petitioner's reply reiterates its conclusory arguments that [the proposed] change would be routine, without identifying any reason to modify the shape from square to circular." Sur-reply 23.

Analysis

As noted above, we find that a preponderance of the evidence establishes that the Mendelson-1988 sensor's optically clear epoxy is a light permeable cover that is arranged above a portion of the housing and covers the sensor's detectors.[10]  In particular, it is clear from Figures 2A and 2B that the epoxy extends from the top of the sensor at the dotted line in the figure, down into the well of the AIRPAX package, to cover all four LEDs and all six photodiodes disposed at the bottom of the well.  *See also* Ex. 1015, 168 ("The optical components were encapsulated inside the package using optically clear adhesive.").

We also conclude that a preponderance of the evidence supports Petitioner's contention that it would have been obvious to modify the top surface of Mendelson-1988's epoxy to include a lens including a single convex surface, in order to increase the amount of backscattered light that will be received by Mendelson-1988's peripheral detectors.  Our reasoning

_____

[10] We note that claim 1 does not recite a "cover."  *See supra* § II.A.1.

IPR2021-00208
Patent 10,258,266 B1

is substantially identical to the analysis provided above in connection with the ground based on Aizawa and Inokawa, with Mendelson-1988 replacing Aizawa in the combination. *See supra* Section II.D.3. Patent Owner does not cite, and we do not discern, any material difference between Mendelson-1988 and Aizawa that might lead to a different result here. For the reasons discussed in Section II.D.3, we do not agree with Patent Owner's arguments that the proposed combination would result in a diminished sensor signal, or that Petitioner improperly relied upon Nishikawa.

Further, we determine that a preponderance of the evidence supports Petitioner's contention that it would have been obvious to modify the shape of Mendelson-1988's AIRPAX package from square to circular. Petitioner's and Dr. Kenny's general assessment that a person of ordinary skill in the art would have been aware that a circular housing shape was a known option for housing of components of a physiological sensor finds support in the record. Pet. 64–65; Ex. 1003 ¶¶ 161–162. In that respect, although Mendelson '799 was not listed in the styling of the proposed grounds of unpatentability based on Mendelson-1988 and Inokawa, its teachings plainly were offered in the Petition as evidence of the background knowledge that an ordinarily skilled artisan would have brought to bear in an evaluation of the teachings Mendelson-1988 and Inokawa. Pet. 64–65. Moreover, it is clear that Patent Owner understood that the proposed ground offered in the Petition took into account the disclosure of Mendelson '799, and Patent Owner had opportunity to address that disclosure. Indeed, Patent Owner availed itself of that opportunity during trial (*see, e.g.*, PO Resp. 53–55; Sur-reply 23–24).

We further find unavailing Patent Owner's argument that "Mendelson '799 does not disclose a cover (or even epoxy encapsulation) and thus cannot disclose a circular housing and a cover of the circular housing, as

IPR2021-00208
Patent 10,258,266 B1

claim 9 requires." PO Resp. 55.   Figure 7 of Mendelson '799 is reproduced below:



*Figure 7*

Figure 7 is a top view of optical sensor 10 comprising light source 12 composed of three LEDs 12A, 12B, and 12C emitting light of three different wavelengths, and an array of six near detectors 18 and six far detectors 16 "arranged in two concentric ring-like arrangements" surrounding light source 12.  Ex. 1025, 9:23–34.  "All these elements are accommodated in a sensor housing 17" which, as can be seen in Figure 7, is clearly circular.  *Id.* at 9:34–35.  Patent Owner does not articulate why the presence or absence of a cover in Mendelson '799 somehow serves to discount Mendelson '799's unambiguous presentation of a sensor housing having a shape recognizable as circular.

Furthermore, one of ordinary skill in the art would have understood that the AIRPAX package of Mendelson-1988 and the housing 17 of Mendelson '799 are performing the same function of enclosing a central collection of light emitters which are surrounded by an array of light

detectors in an optical sensor attached to a user's body. *See, e.g.*, Ex. 1015, Figs. 2A–2B; Ex. 1025, Fig. 7. The evidence of record also does not suggest that the shape of such a housing has any functional significance in the operation of the optical sensor, or that any particular known shape was preferred or restricted. Thus, the evidence suggests that a square shape and a circular shape of such as housing were known in the art to be predictable substitutes for one another, and therefore obvious variants. *See, e.g.*, *KSR*, 550 U.S. at 416 ("[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result."); *id.* at 417 ("[W]hen a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." (citation omitted)).

We conclude Petitioner has demonstrated by a preponderance of the evidence that Petitioner's ground based on Mendelson-1988 and Inokawa conveys the unpatentability of claim 9.

### 4. *Dependent Claims 2–6, 8, 10–16, 18, and 19*

Petitioner presents undisputed contentions that claims 2–6, 8, 10–16, 18, and 19, which depend directly or indirectly from independent claim 1 or 9, are unpatentable over the combined teachings of Mendelson-1988 and Inokawa, and provides arguments explaining how the references teach the limitations of these claims. Pet. 56–63, 67–71; Ex. 1003 ¶¶ 144–157, 166–175.

Patent Owner does not present any arguments for these claims other than those we have already considered with respect to independent claim 1.

IPR2021-00208
Patent 10,258,266 B1

PO Resp. 57 ("The Petition fails to establish that independent claims 1 and 9 are obvious . . . and therefore fails to establish obviousness of any of the challenged dependent claims.").

We have considered the evidence and arguments of record and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2–6, 8, 10–16, 18, and 19 would have been obvious over the combined teachings of the cited references and as supported by the testimony of Dr. Kenny.

### F.  *Obviousness over the Combined Teachings of Aizawa, Inokawa, and Ohsaki*

Petitioner contends that claims 1–6, 8–16, 18, and 19 of the '266 patent would have been obvious over the combined teachings of Aizawa, Inokawa, and Ohsaki.  Pet. 44–46.

Because we have already determined that these claims are unpatentable based on Aizawa and Inokawa, and Mendelson-1988 and Inokawa, which is dispositive as to all challenged claims, we need not reach this additional ground.  *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) (holding that a petitioner "is entitled to a final written decision addressing all of the claims it has challenged"); *Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) ("[T]he Board need not address issues that are not necessary to the resolution of the proceeding."); *see supra* §§ II.D–E.

IPR2021-00208
Patent 10,258,266 B1

## III. CONCLUSION

In summary:[11]

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–6, 8–16, 18, 19 | 103 | Aizawa, Inokawa | 1–6, 8–16, 18, 19 | |
| 1–6, 8–16, 18, 19 | 103 | Mendelson-1988, Inokawa | 1–6, 8–16, 18, 19 | |
| 1–6, 8–16, 18, 19 | 103[12] | Aizawa, Inokawa, Ohsaki | | |
| **Overall Outcome** | | | 1–6, 8–16, 18, 19 | |

_____

[11] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[12] As explained above, because we conclude that the challenged claims are unpatentable on other grounds, we do not reach the merits of this ground.

IPR2021-00208
Patent 10,258,266 B1

## IV. ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 1–6, 8–16, 18, and 19 of the '266 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00208
Patent 10,258,266 B1

FOR PETITIONER:

Walter Renner
Andrew B. Patrick
Hyun Jin In
Dan Smith
FISH & RICHARDSON P.C.
Axf-ptab@fr.com
patrick@fr.com
in@fr.com
PTABInbound@fr.com


FOR PATENT OWNER:

Joseph R. Re
Stephen W. Larson
Jarom D. Kesler
Jacob L. Peterson
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2jup@knobbe.com

IPR2021-00208 – Patent 10,258,266
Apple v. Masimo

# CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via

U.S.P.S. Priority Mail Express on July 27, 2022 with the Director of the United

States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450

A copy of this Notice of Appeal is being filed and served on July 27, 2022 as

follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTABe2e – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.**

W. Karl Renner
Hyun Jin In
Dan Smith
Andrew B. Patrick
Fish & Richardson P.C.

IPR2021-00208 – Patent 10,258,266
Apple v. Masimo

3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
IPR50095-0007IP1@fr.com
PTABInbound@fr.com
in@fr.com

Dated:  July 27, 2022        By:  /Jarom Kesler/
                                  Jarom D. Kesler (Reg. No. 57,046)
                                  Joseph R. Re (Reg. No. 31,291)
                                  Stephen W. Larson (Reg. No. 69,133)
                                  Jacob L. Peterson (Reg. No. 65,096)
                                  Attorneys for Patent Owner
                                  Masimo Corporation

55958381